*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) | Supreme Court No. S-15428 |
| DAKOTA K. | ) ) ) ) ) ) ) | Superior Court No. 3AN-13-03006 PR<br><br>O P I N I O N<br><br>No. 7041 – August 28, 2015 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: Sharon Barr, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant Dakota K. Jonathan A. Woodman, Senior Assistant Attorney General, Anchorage, and Craig W. Richards, Attorney General, Juneau, for Appellee State of Alaska.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

STOWERS, Justice.

## I. INTRODUCTION

Dakota K.[1] appeals a 30-day involuntary psychiatric commitment. Although his appeal is moot, Dakota argues the collateral consequences exception to the mootness doctrine applies. Under that exception we have presumed collateral

---

[1] Pseudonyms have been used to protect the privacy of the parties.

consequences from a respondent's first involuntary commitment. In this case the parties dispute whether the State or the respondent has the burden to prove the existence of prior involuntary commitments. We hold that this burden rests on the respondent, who must make some evidentiary showing that the commitment was his first in order to raise the presumption of collateral consequences.

## II.    FACTS AND PROCEEDINGS

In December 2013 two Alaska Psychiatric Institute (API) mental health professionals petitioned the superior court for a 30-day commitment of Dakota K. The following day Magistrate Judge Una S. Gandbhir held a hearing at API. During the hearing Dakota's father, Daniel, testified that Dakota had gone to graduate school in Iceland and had been living with him since Dakota's return in August 2012. By the following year their relationship had become contentious, and shortly after Thanksgiving Daniel told Dakota that he would have to make alternative living arrangements.

Daniel testified that Dakota then went on a "reign of terror." According to Daniel, Dakota came to his apartment several times, knocked on the door, and before Daniel answered — Daniel uses a mobility scooter and it took time to cross the room — Dakota rammed the door with a heavy metal tool or a cart. In another incident Dakota threatened Daniel with a crescent wrench.[2] Dakota once removed the key from Daniel's mobility scooter, leaving him immobilized. Finally, Dakota sent Daniel "a hundred . . . texts" asking Daniel whether he wanted to die and saying that Daniel did not deserve to live.

Daniel obtained a restraining order against Dakota. Nevertheless, Dakota repeatedly returned to Daniel's apartment in violation of that order. The police arrested

---

[2]    Dakota denies this, though the superior court apparently found Daniel's testimony more credible and found that this event had occurred.

Dakota after one of these visits. Daniel testified that Dakota's recent behavior had been "extremely abnormal" and was "downright scary." He further testified that Dakota had psychiatric issues as an adolescent, once threatening Daniel with a piece of broken glass and once threatening to kill himself.

In December 2013 Dakota was admitted to API, where he was evaluated by a psychiatrist, Dr. Anthony Blanford. The first evaluation occurred the day after Dakota's admission — which was two days before the commitment hearing — and two other evaluations followed, as well as regular observations. Although Dr. Blanford did not make a formal diagnosis, he testified that Dakota's behavior at API was "very consistent with irritable mania and bipolar disorder." He explained that Dakota "demonstrated pressured speech, frequent interruption, . . . would derail easily, . . . would frequently change the subject, declined to answer questions, [and] was very loud." He further stated that there was "an aggressive aspect" to Dakota's behavior: Dakota had threatened to "shove soap down a staff member's throat" and warned another that he would cause "a blood bath on this unit" if he did not receive his medication. Dr. Blanford recommended that Dakota remain at API until he was "able to control his behavior" and was less prone to "assaultive behavior."

After the hearing Magistrate Judge Gandbhir orally granted the 30-day commitment petition. Superior Court Judge Andrew Guidi signed the written order one day later. The court found that Dakota was "mentally ill and as a result is likely to cause harm to others." It noted his "aggressive and threatening behavior leading up to the restraining order," as well as his "subsequent arrest for violation of that order." It further noted Dr. Blanford's testimony regarding Dakota's "lack of impulse control" and "the threats and behavior culminating in crisis medication at API." The court found "clear and convincing evidence" that Dakota posed a risk to others and that "[n]o less restrictive facility would adequately protect [Dakota] and the public." Dakota was committed to

API for a period not to exceed 30 days. He appealed the commitment order after his release, challenging the sufficiency of the evidence.

## III. STANDARD OF REVIEW

"Mootness is a matter of judicial policy and its application is a question of law."[3] "We adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[4]

## IV. DISCUSSION

Mootness is a judicially created doctrine meant to promote expediency and judicial economy.[5] "A claim is moot if it is no longer a present, live controversy, and the party bringing the action would not be entitled to relief, even if it prevails."[6] "Mootness can also occur when a party no longer has a personal stake in the controversy and has, in essence, been divested of standing."[7]

In *Wetherhorn v. Alaska Psychiatric Institute* we held that appeals of commitment orders based on insufficient evidence are generally moot after the

---

[3]     *In re Joan K.*, 273 P.3d 594, 595-96 (Alaska 2012).

[4]     *Id*. at 596 (quoting *Olson v. State*, 260 P.3d 1056, 1059 (Alaska 2011)) (internal quotation marks omitted).

[5]     *See In re Mark V.*, 324 P.3d 840, 849 (Alaska 2014) (Stowers, J., dissenting); *see also Honig v. Doe*, 484 U.S. 305, 330-32 (1988) (Rehnquist, C.J., concurring).

[6]     *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 380 (Alaska 2007) (quoting *Fairbanks Fire Fighters Ass'n, Local 1324 v. City of Fairbanks*, 48 P.3d 1165, 1167 (Alaska 2002)) (internal quotation marks omitted).

[7]     *Fairbanks Fire Fighters Ass'n*, 48 P.3d at 1167 (quoting 15 MARTIN H. REDISH, MOORE'S FEDERAL PRACTICE § 101.90 (3d ed. 1998)) (internal quotation marks omitted).

commitment period has passed.[8]  But *In re Joan K.* established a collateral consequences exception to this general principle.[9]  We noted that involuntary commitment carries various collateral consequences, including "social stigma, adverse employment restrictions, application in future legal proceedings, and restrictions on the right to possess firearms."[10]  This exception to mootness had already been recognized in other contexts and "allows courts to decide otherwise-moot cases when a judgment may carry indirect consequences in addition to its direct force, either as a matter of legal rules or as a matter of practical effect."[11]

In *Joan K.* we held that collateral consequences could be presumed to flow from a first involuntary commitment.[12]  In reaching this conclusion, we reasoned that "some number of prior involuntary commitment orders would likely eliminate the

---

[8]      *Wetherhorn*, 156 P.3d at 380 ("[T]he thirty-day period for which Wetherhorn was committed has long since passed, and the question is thus moot.").

*Wetherhorn* also established a public-interest exception to this general rule. *Id*.  Under this exception, the court considers three factors:  "(1) whether the disputed issues are capable of repetition, (2) whether the mootness doctrine, if applied, may cause review of the issues to be repeatedly circumvented, and (3) whether the issues presented are so important to the public interest as to justify overriding the mootness doctrine."  *Id.* at 380-81 (quoting *Akpik v. State, Office of Mgmt. & Budget*, 115 P.3d 532, 536 (Alaska 2005)) (internal quotation marks omitted).  Dakota concedes that his appeal is based on a claim of insufficient evidence and that the public interest exception to mootness does not apply.

[9]      273 P.3d 594, 598 (Alaska 2012).

[10]     *Id*. at 597 (footnotes omitted).

[11]     *Id*. at 597-98 (quoting *Peter A. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 146 P.3d 991, 994-95 (Alaska 2006)) (internal quotation marks omitted).

[12]     *Id.* at 598.

possibility of additional collateral consequences, precluding the [exception's] application."[13]

At issue in this appeal is who bears the burden of establishing whether the involuntary commitment order is Dakota's first; this question has not yet been decided in Alaska.[14] Dakota contends that this burden falls on the State because: (1) "the [S]tate has access to the information concerning prior involuntary commitments"; (2) "the [S]tate bears the burden of proof at an involuntary commitment hearing"; and (3) "[g]iven that it is the [S]tate who is trying to commit the respondent, it should also be the party responsible for proving any prior involuntary commitments."

The State contends that the burden should fall on Dakota. The State notes that Dakota "has not even alleged, much less established, that he has no prior involuntary commitments."[15] It contends that Dakota should "at least affy that the commitment being appealed is his first." And it notes that if Dakota "had been involuntarily committed in another jurisdiction . . . ,[the State] would have no way of proving whether this commitment was [his] first, or just one of many."

---

**13** *Id.*

**14** *See In re Stephen O.*, 314 P.3d 1185, 1192 n.18 (Alaska 2013) ("While Stephen and the State agree that we should consider the merits of Stephen's challenge, they disagree about which party should bear the burden of establishing whether a patient has previously been subject to involuntary commitment. But because the parties stipulated that Stephen's previous hospitalization was voluntary, we do not decide this issue."); *In re Jeffrey E.*, 281 P.3d 84, 86 (Alaska 2012) ("[B]ecause this was Jeffrey's first involuntary commitment we consider his appeal under the collateral consequences exception to mootness recently adopted in . . . *Joan K.*").

**15** Daniel testified that Dakota went to API as an adolescent and escaped by climbing over a 17-foot fence. The record does not reflect whether his term there was voluntary or involuntary.

This issue has not received much treatment in other jurisdictions. Dakota points to *In re McCaskill*, in which the Minnesota Supreme Court held that collateral consequences should be presumed if "real and substantial disabilities attach to a judgment."[16] But *Joan K* applied this presumption only to first commitments.[17] The Iowa Supreme Court cited *Joan K.* in holding that "we believe prior involuntary commitments are better used as evidence to rebut the presumption of collateral consequences, rather than to deny the existence of collateral consequences."[18] This is consistent with *Joan K.*, which holds that prior involuntary commitments "would *likely* eliminate the possibility of additional collateral consequences,"[19] leaving open the possibility that in a given case, multiple involuntary commitments might be shown to give rise to collateral consequences.

Other jurisdictions have held that the respondent bears the burden of establishing that the collateral consequences exception applies, but those holdings have generally not been within the involuntary commitment context.[20] The Illinois Supreme

---

[16]    603 N.W.2d 326, 329 (Minn. 1999) (quoting *Morrissey v. State*, 174 N.W.2d 131, 133 (Minn. 1970)) (internal quotation marks omitted).

[17]    *Joan K.*, 273 P.3d at 597-98.

[18]    *In re B.B.*, 826 N.W.2d 425, 431 (Iowa 2013) (citing *Joan K.*, 273 P.3d at 597).

[19]    *Joan K.*, 273 P.3d at 598 (emphasis added).

[20]    *See, e.g.*, *DeFoy v. McCullough*, 393 F.3d 439, 442 n.3 (3d Cir. 2005) (Stating the habeas corpus context, "[i]t is a petitioner's burden to demonstrate that collateral consequences exist to avoid having a case dismissed as moot"); *Holton v. Dep't of Emp't & Training*, 878 A.2d 1051, 1057 (Vt. 2005) (Stating the employment context, the appellant "has not met its burden of establishing that its case fits within a recognized exception to the mootness doctrine; we cannot, therefore, review its appeal

(continued...)

Court held that the burden falls on the respondent, but this holding is somewhat inapposite insofar as Illinois — unlike Alaska — does not have the presumption that collateral consequences apply, even to the first involuntary commitment.[21]

We agree with the State that the burden to establish the fact of collateral consequences should be on the respondent. In *Wetherhorn* we concluded that appeals challenging the sufficiency of the evidence in involuntary commitment cases are moot.[22] In these kinds of appeals, it is the State that typically seeks dismissal of the appeal based on mootness. The State need do nothing more than assert its reliance on our holding in *Wetherhorn* to make its prima facie case that the appeal is moot. A respondent wishing to oppose the State, would have to allege, *and make some evidentiary showing at least raising a genuine issue of material fact*, that the commitment was a first involuntary commitment — or make an evidentiary showing attempting to establish some factual basis for a finding of collateral consequences. This is because it is the respondent who is seeking to invoke the exception to the mootness doctrine.[23]

---

[20](...continued)
on the merits").

[21]     *In re Alfred H.H.*, 910 N.E.2d 74, 85 (Ill. 2009) ("Respondent's case is moot and he has failed to establish that any exception to the mootness doctrine applies in this case."); *see also In re Hays*, 465 N.E.2d 98, 100 (Ill. 1984).

[22]     *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 380 (Alaska 2007).

[23]     Dakota argues that "the [S]tate itself is alleging that the respondent is mentally ill" and, therefore, he "will not be competent to sign such an affidavit." But under Alaska Evidence Rule 601, mental illness is not necessarily a bar to competency:

> A person is competent to be a witness unless the court finds
> that (1) the proposed witness is incapable of communicating
> concerning the matter so as to be understood by the court and
> jury either directly or through interpretation by one who can

(continued...)

Involuntary commitment proceedings are necessarily expeditious. There is a limited amount of time for the respondent's attorney to meet the client, obtain legal and medical records, and marshal a defense to the underlying allegations of mental illness and risk of harm to self or others. It is therefore unrealistic to expect that the attorney would also present evidence during the commitment proceedings to establish collateral consequences for the purposes of a potential appeal. But after the trial court proceedings have concluded it would be entirely appropriate for the respondent to seek an evidentiary hearing in the superior court on the issue of collateral consequences. This evidentiary hearing would be for the limited purpose of obtaining findings from the court that the commitment was the first involuntary one or, if it were not the first, that there are other collateral consequences flowing from the commitment that would be avoided if it were reversed on appeal.

If the respondent does not obtain a hearing in the superior court and files an appeal challenging the commitment order on sufficiency of evidence grounds, the State can file a motion to dismiss based on mootness, and the respondent would then

---

[23](...continued)
> understand the proposed witness, or (2) the proposed witness is incapable of understanding the duty of a witness to tell the truth.

While this rule has not been interpreted with regards to the present context, many other jurisdictions have specifically held that "persons suffering from mental disorders often satisfy . . . competency standards [for testifying]." 4 KENNETH S. BROUN, MCCORMICK ON EVIDENCE § 62 (7th ed. 2013); *see also Dorsey v. Chapman*, 262 F.3d 1181, 1183 (11th Cir. 2001) (multiple personality disorder); *Andrews v. Neer*, 253 F.3d 1052, 1062-63 (8th Cir. 2001) (schizophrenia); *People v. Rensing*, 199 N.E.2d 489, 490 (N.Y. 1964) ("The mere fact that one is insane or mentally ill does not per se disqualify him from testifying."); *People v. Gipson*, 12 Cal. Rptr. 3d 478, 483 (Cal. App. 2004) ("The fact that [a prospective witness] may have suffered from mental disorders does not by itself support the claim that he is incapable [of being a witness].").

have the burden of making some evidentiary showing either that this was the first involuntary commitment or that there is some other factual basis for claiming collateral consequences. The burden would then shift to the State to dispute the respondent's showing. If the State does not dispute the respondent's showing, then this court could reach the merits of the respondent's challenge to the commitment order. If an evidentiary hearing were necessary to resolve the dispute, remand to the superior court for an evidentiary hearing and findings might be appropriate.

In this case, Dakota has never even alleged, much less made an evidentiary showing suggesting, that his involuntary commitment at API was his first and therefore gives rise to a presumption of collateral consequences. Nor has he alleged that the exception should apply because of any actual collateral consequences. We therefore decline to apply the collateral consequences exception to the mootness doctrine.

## V.    CONCLUSION

We conclude that Dakota's appeal from the superior court's order of involuntary commitment is MOOT. The appeal is DISMISSED.