*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) | Supreme Court No. S-15328 |
| REID K. | ) ) | Superior Court No. 4FA-13-00446 PR |
| | ) ) | O P I N I O N |
| | ) ) | No. 7051 – September 25, 2015 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Paul R. Lyle, Judge.

Appearances: Rachel Cella, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant Reid K. Janell M. Hafner, Assistant Attorney General, and Michael C. Geraghty, Attorney General, Juneau, for Appellee State of Alaska.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

FABE, Chief Justice.

## I. INTRODUCTION

In August 2013 the superior court entered a 30-day involuntary civil commitment order for Reid K.[1] After holding a contested evidentiary hearing, the superior court found that Reid was likely to harm others and that no less restrictive

---

[1] Pseudonyms have been used to protect the privacy of the parties.

alternative existed to prevent potential harm. Reid appeals that 30-day commitment.

Shortly after Reid's 30-day commitment, Reid's doctors petitioned for a 90-day commitment. At the trial on the requested 90-day commitment, Reid stipulated that he was mentally ill and, as a result, was likely to cause harm to himself or others. Reid's 30-day commitment order thus does not have collateral consequences in light of his subsequent 90-day commitment based on his stipulation. Moreover the public interest exception to the mootness doctrine does not apply. Reid's appeal is therefore dismissed as moot.

## II.    FACTS AND PROCEEDINGS

Reid K., age 26, was diagnosed with paranoid schizophrenia at age 16. He experiences delusions and severe command auditory hallucinations in the form of seven different voices that often instruct him to harm and kill other people, including members of his family and his home village. Reid has been prescribed antipsychotic medication since age 16 to help control his hallucinations and manage his illness, but he has repeatedly stopped taking his medications as prescribed. When Reid stops taking his prescribed medications or smokes large quantities of marijuana, which he does regularly, the voices increase in intensity and his hallucinations get worse.

Reid has previously acted on his hallucinations by taking steps toward homicidal acts. In 2012, in response to voices in his head, Reid attempted to kill his brother with a sword. Reid was hospitalized in November 2012 and again prescribed psychiatric medication, though it is unclear whether that hospitalization required an involuntary commitment. Following Reid's discharge from the hospital, Reid met telephonically with his outpatient psychiatrist, Dr. Joshua Sonkiss, who was responsible for overseeing Reid's medication regimen.

Reid stopped taking his medication soon after his release from the hospital in 2012. He testified that he stopped taking his medication because he wanted to see

-2-                                    **7051**

"how far [he] would go before anything could happen." Reid missed between ten and twenty percent of his outpatient appointments with Dr. Sonkiss and did not disclose to Dr. Sonkiss that he had stopped taking his medication as prescribed. Reid heard voices telling him to kill people for up to seven of the eight months after being off his medications.

Reid's treatment plan required that he abstain from alcohol and marijuana because his doctors believed those substances would exacerbate Reid's disorder and make his psychosis worse. But Reid regularly used marijuana as a "stress reliever." At one point Reid told Dr. Sonkiss that he had smoked marijuana 22 out of the past 30 days in addition to using "lots of other substances."

By August 2013 Reid's command auditory hallucinations had intensified and were telling him to carry out a mass murder, beginning with his family and continuing to each of the 400 residents of his village. In response to these hallucinations, Reid obtained a 7-millimeter firearm that he planned to use to kill residents at an upcoming village gathering. But when Reid went to buy ammunition, he discovered that the store did not have the correct type of bullets in stock. A few days later, Reid began having what he characterized as momentary "conscience," and he reported his homicidal plans to Dr. Sonkiss, admitting that his symptoms had gotten "out of control."

On August 16, 2013, Reid was voluntarily admitted for treatment at Fairbanks Memorial Hospital. After his first week of hospitalization, Reid thought he no longer needed inpatient treatment because he had come to realize that the voices were telling him to do a "bad thing" and that his family was prepared to help him. His inpatient treating psychiatrist, Dr. Monique Dase, filed a petition for involuntary commitment for evaluation on August 26, 2013, and the following day obtained a court order committing Reid to the hospital for evaluation.

Two days later, on August 28, 2013, Dr. Dase filed a petition for a 30-day commitment.[2] The petition described Reid's "plan to kill people in his village," his history of medication noncompliance, and his substance abuse. The petition alleged that Reid was "likely to cause harm" to others and that "[t]he evaluation staff has considered, but has not found, any less restrictive alternatives available that would adequately protect [Reid] or others." The superior court held a contested hearing on the 30-day commitment petition the next day. Dr. Dase and Dr. Sonkiss testified in support of the petition, and Reid, represented by counsel, testified on his own behalf.

Dr. Dase testified that she was Reid's treating psychiatrist at Fairbanks Memorial Hospital and that she had met with Reid most days during his hospitalization. During Reid's hospitalization, Dr. Dase completed a psychiatric evaluation and confirmed Reid's earlier diagnosis of schizophrenia based on his command auditory hallucinations, which "provide commentary or tell [Reid] to do things to harm himself or others." She testified that Reid told her he heard multiple voices in his head that had "become really strong, and [would] tell him to hurt other people" when he did not take his medication as prescribed. She also testified that Reid had "been diagnosed with cannabis dependence and ha[d] a history of alcohol abuse," and that Reid had told her that smoking "too much pot," drinking alcohol, and not sleeping made his hallucinations worse. Dr. Dase cited studies showing a connection between substance abuse and an increased risk of violence in schizophrenics with violent tendencies.

Dr. Dase warned the court that Reid did not seem to understand that his condition was chronic and that he posed a significant risk to others if he did not follow through with every part of his treatment, including medication compliance,

---

[2] On August 28, 2013, Dr. Dase also filed a petition to administer psychotropic medication, though she withdrew the petition the next day.

communicating with treatment providers, and abstaining from drugs and alcohol. Before the hearing Dr. Dase had prescribed a weekly injectable form of antipsychotic medication, but she cautioned that the injection would not be fully effective for another two weeks and that during that time Reid would need to take the drug in a daily oral form. She testified that if Reid was discharged, he would return to a stressful home environment where he would be exposed to alcohol and other substances and would likely stop taking his medication, which would cause a relapse or a "worse situation." Dr. Dase testified that Reid's home environment was a potential symptom trigger because some of Reid's family members had historically been unsupportive of his treatment and medication needs. She noted that Reid had learned to mask his symptoms from his family, who she said were unaware of the extent of his recent planned attack. Dr. Dase testified that, in her opinion, there was no less restrictive alternative to hospitalization that could meet Reid's needs and keep the community safe.

Dr. Sonkiss, Reid's outpatient psychiatrist and Dr. Dase's supervisor, also testified at Reid's 30-day commitment hearing. He confirmed Reid's schizophrenia diagnosis and testified in detail about Reid's hallucinations and delusions. Dr. Sonkiss testified that the only reason Reid did not carry out the planned village killings was because Reid did not have the bullets. Dr. Sonkiss agreed with Dr. Dase's conclusion that substance abuse negatively impacted Reid's condition and that Reid posed a danger to others due to his auditory hallucinations. Dr. Sonkiss testified that "scientific research shows very clearly that smoking marijuana . . . for people who already have a psychotic disorder, it exacerbates it . . . [and] in [Reid's] case there's some research that indicates marijuana increases violence risk by about a factor of four."

Dr. Sonkiss also testified regarding Reid's history of medication noncompliance and warned that Reid "isn't honest about his medication use when he's an outpatient." In Dr. Sonkiss's opinion, Reid's previous failure to follow his medication

regimen necessitated continued hospitalization, particularly since the injectable antipsychotic had yet to take effect. Dr. Sonkiss testified that outpatient care was not yet appropriate since Reid did not have a treatment plan and services in place to provide Reid with adequate monitoring and to ensure community safety in light of what Dr. Sonkiss characterized as "a very unusual and extremely dangerous situation." Dr. Sonkiss testified that, in his opinion, Reid posed a substantial risk of harm to himself and others and that his mental illness was "very, very likely [to] drive him to . . . commit a tragic act."

Reid was the final witness to testify. Reid did not dispute that he is mentally ill. He confirmed that he hears voices in his head that command him to kill people, discussed his plans to kill members of his village, and acknowledged his previous decision to stop taking psychiatric medications shortly after his release from the hospital eight months earlier. Reid conceded that he needs to be on medication because "[i]f not, something really bad can happen." He denied that his marijuana use was a problem and instead characterized it as a coping skill, testifying that he needed to use marijuana when he encountered difficult times with depression and family problems. Reid testified that he no longer needed to be hospitalized and asked to be discharged to live with his grandmother, where, he asserted, his sister would help distribute his medication so that "someone will know that I'm taking [it]."

At the conclusion of the hearing, the superior court found that there was clear and convincing evidence showing Reid was mentally ill and that, as a result of his mental illness, he was likely to cause harm to others. The superior court based its latter finding on Reid's recent plans to kill members of his village; his history of medication noncompliance; his marijuana use and "credible testimony from the experts . . . that . . . marijuana use exacerbates his schizophrenic symptoms"; and Reid's lack of insight into his illness as demonstrated by his continued drug use because it "exacerbates the voices

that he hears when he's off his medication, as well as when he's on his medication." The superior court also found that a 30-day commitment was the least restrictive alternative to prevent potential harm. The court based its least-restrictive-alternative finding on the inadequacy of Reid's proposed outpatient plan, reasoning that Reid's sister did not have the ability to ensure that Reid would follow the medication regimen necessary to reduce his likelihood of harming others; that Reid's family could not adequately supervise Reid and know when he might pose a risk to others because Reid had learned to mask his symptoms; and that Reid's village did not have a sufficient law enforcement presence to protect the community should Reid attempt to harm others. On August 29, 2013, the court signed an order for a 30-day commitment.

One month later, after the initial 30-day commitment expired, Dr. Sonkiss filed a petition for a 90-day commitment, alleging that Reid was still likely to cause harm to himself or others. The matter proceeded to a jury trial but the parties ultimately stipulated that Reid "is mentally ill" and as a result, "he is likely to cause harm to himself or others."[3] The superior court signed an order for a 90-day commitment in October 2013.

Reid now appeals the superior court's 30-day commitment order in August 2013 and asks us to reverse and vacate the order.

---

[3] We may take judicial notice of Reid's stipulation on the record and the accompanying 90-day commitment order, both of which were entered subsequent to the superior court's 30-day commitment order. *See* Alaska R. Evid. 201; *Gilbert M. v. State*, 139 P.3d 581, 583 n.3 (Alaska 2006) (taking judicial notice of a party's conviction and sentence, which were not part of trial court record, under Alaska Evidence Rules 201 and 203).

## III. STANDARD OF REVIEW

Whether an issue is moot is a "matter of judicial policy and . . . a question of law" to which we apply our independent judgment.[4]

## IV. DISCUSSION

### A. Reid's Appellate Claims Are Barred On Procedural Grounds Because His Case Is Moot And Not Subject To Any Mootness Exception.

"A claim is moot if it is no longer a present, live controversy, and the party bringing the action would not be entitled to relief, even if it prevails. Appeals of commitment orders that are based on assertions of insufficient evidence are moot if the commitment period has passed, subject to two exceptions: the public interest exception and the collateral consequences exception."[5] Reid argues that both mootness exceptions apply here. We conclude that Reid's arguments are moot because the period of commitment under the 30-day order has expired and neither mootness exception applies,[6]

---

[4]     *In re Joan K.*, 273 P.3d 594, 595-96 (Alaska 2012).

[5]     *In re Mark V.*, 324 P.3d 840, 843 (Alaska 2014) (quoting *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 380 (Alaska 2007)) (internal quotation marks omitted).

[6]     Reid requests that if we find his appeal is not subject to either mootness exception that we remand "for consideration of whether Reid received ineffective assistance of counsel and stay his appeal pending resolution of that issue." Reid questions "whether [he] received effective assistance of counsel when entering the 90-day stipulation." "When we review the question whether a litigant has raised successfully an ineffective assistance challenge, we apply [a] two-pronged test . . . . Under the first prong, the litigant must show that her attorney's performance was below a level that any reasonably competent attorney would provide, bearing in mind that reasonable tactical decisions are virtually immune from subsequent challenge even if, in hindsight, better approaches could have been taken. Under the second prong, the litigant must demonstrate that counsel's improved performance would have affected the outcome of the case." *Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's*
(continued...)

and thus affirm the superior court's order.

### 1. The public interest exception to mootness does not apply.

We will consider a question that is otherwise moot if the question "falls within the public interest exception to the mootness doctrine."[7] Three factors govern whether the public interest exception applies: "(1) whether the disputed issues are capable of repetition, (2) whether the mootness doctrine, if applied, may cause review of the issues to be repeatedly circumvented, and (3) whether the issues presented are so important to the public interest as to justify overriding the mootness doctrine."[8] Based on his substantive challenges, Reid argues that all three factors of the public interest exception to mootness are met here.

First, Reid argues that the disputed issues are likely to recur because he challenges the methods his doctors used to form their professional opinions and those methods are not unique to the facts of this case. He also asserts that "such questions will recur and will otherwise evade appellate review due to the quick expiration of commitment orders." Finally, Reid notes that we have previously applied the exception to commitment appeals that raise questions of statutory interpretation and are thus

---

[6](...continued)
*Servs.*, 336 P.3d 1258, 1265 (Alaska 2014) (quoting *Chloe O. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 850, 858-59 (Alaska 2013)) (internal quotation marks and citation omitted). Here, Reid fails to explain how his attorney's performance in entering the stipulation fell below the level that a reasonably competent attorney would provide and thus has not satisfied the first prong of establishing ineffective assistance of counsel. We therefore decline his invitation to remand the case rather than dismissing the appeal as moot.

[7]     *Wetherhorn*, 156 P.3d at 380.

[8]     *Akpik v. State, Office of Mgmt. & Budget*, 115 P.3d 532, 535 (Alaska 2005) (quoting *Kodiak Seafood Processors Ass'n v. State*, 900 P.2d 1191, 1196 (Alaska 1995)).

important to the public interest.[9] Reid argues that his appeal "raises important questions concerning how the 'harm to others' and 'least restrictive alternative' provisions of the commitment statutes should be interpreted," and thus meets the third public interest exception factor. The State counters that the public interest exception "does not apply because unlike appeals raising matters of statutory interpretation, Reid's appeal presents a discrete challenge to the sufficiency of the evidence."

Reid challenges the superior court's finding that he was likely to cause harm to others in the future. He argues that "[t]he trial court clearly erred in [finding] that [he] was likely to harm others given the lack of reliability of clinical predictions; the court's improper reliance on medication noncompliance as a factor in the commitment decision; and the speculative and attenuated connection between marijuana use and violence."

In particular, Reid challenges the sufficiency of the evidence based on the alleged unreliability of the unstructured clinical risk assessments used by Dr. Dase and Dr. Sonkiss to predict that Reid was likely to harm others, as well as their citation of studies showing a link between marijuana use and increased risk of violence in schizophrenics. Reid's arguments turn on factual questions regarding the reliability of clinical tests and marijuana studies, not questions of statutory interpretation, as he suggests. Reid points to no statutory language to suggest that the legislature sought to disallow this type of evidence. And the trial court is the most appropriate forum in which to evaluate and weigh competing fact-based arguments regarding the reliability of

---

[9] *See Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 179, 183-84 (Alaska 2009); *E.P. v. Alaska Psychiatric Inst.*, 205 P.3d 1101, 1107 (Alaska 2009).

evidence showing that an individual is likely to harm others.[10] Reid's appeal is thus not subject to the public interest exception.

## 2. The collateral consequences exception to mootness does not apply.

In *In re Joan K.*, we adopted the collateral consequences exception as a second exception to mootness in the involuntary commitment context.[11] This exception "allows courts to decide otherwise-moot cases when a judgment may carry indirect consequences in addition to its direct force, either as a matter of legal rules or as a matter of practical effect."[12] We recognized that involuntary commitment may carry various collateral consequences, including "social stigma, adverse employment restrictions, application in future legal proceedings, and restrictions on the right to possess firearms."[13]

*Joan K.* held that collateral consequences can be presumed for "a person's first involuntary commitment order."[14] We reasoned that some number of prior involuntary commitments beyond an individual's first commitment "would likely eliminate the possibility of additional collateral consequences, precluding the [exception's] application."[15] We suggested in *In re Mark V.* that there may be

---

[10] *See State v. Coon*, 974 P.2d 386, 396 (Alaska 1999) ("Determining reliability for judicial purposes is unavoidably the responsibility of trial courts . . . .").

[11] 273 P.3d 594, 597-98 (Alaska 2012).

[12] *Id.* at 597-98 (quoting *Peter A. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 146 P.3d 991, 994-95 (Alaska 2006)).

[13] *Id.* at 597 (citations omitted).

[14] *Id.* at 598.

[15] *Id.*

"incrementally significant collateral consequences" to commitments that occur after an individual's first commitment, but reasoned that appellants must show a "plausible likelihood" of such additional collateral consequences.[16]

The State argues that Reid's 90-day commitment renders his appeal moot because "there is no longer any indication that the 30-day commitment order will cause Reid to suffer any independent or readily cognizable added collateral consequences" because any consequences "now presumably attach with equal force to Reid's 90-day commitment order." Reid responds that there are "incrementally significant" and discrete collateral consequences that attach to the 30-day order as opposed to the 90-day order, based on a perceived distinction between the judicial determination made after the contested 30-day hearing and the judicial determination based on Reid's stipulation at the 90-day hearing.

But any consequences arising from Reid's 30-day commitment order are subsumed within his subsequent 90-day commitment order, which were both adjudicated orders. This conclusion may have been different if Reid had voluntarily committed himself for the 90 days of treatment, but he did not: His 90-day commitment was the product of a court process that was ultimately resolved by Reid stipulating to the findings necessary for a court-ordered commitment. There is no meaningful distinction between the collateral consequences arising from a trial court's commitment order that is based on the court's factual findings after a contested hearing and the consequences arising from a trial court's commitment order that is based on facts stipulated by the parties. Thus Reid's 30-day commitment, which was the result of the trial court's factual finding, carries the same consequences as his 90-day commitment, where the trial court's findings were based on Reid's factual stipulations. As a result, the collateral consequences

_____

[16]    324 P.3d 840, 845 (Alaska 2014).

exception does not apply to Reid's appeal of the 30-day order, and his claims are thus barred on mootness grounds.

**B.** **Challenges To Expired Commitment Orders Are Generally Moot Under *Wetherhorn*, And Thus It Is Best Practice For The State To Move To Dismiss Such Challenges As Moot Before Proceeding To Appellate Briefing.**

This case centered on Reid's appeal of a commitment order, which the State first challenged as moot in its appellee's brief. As a result, Reid did not have a chance to try to demonstrate that his claims are not moot or that they fall within an exception to the mootness doctrine until his reply brief. This is problematic because in order for the collateral consequences exception to mootness to apply, appellants have the burden to show that the commitment they are challenging is their first commitment, or that other incrementally significant consequences flow from it.[17]

To avoid the procedural challenges that result when the State does not raise mootness arguments until its appellee's brief, we take this opportunity to clarify best practices regarding appeals of commitment orders. In *Wetherhorn v. Alaska Psychiatric Institute* we held that appeals of commitment orders based on insufficient evidence are generally moot after the commitment period has passed.[18] In many, if not most cases, the court can determine whether there is a live controversy prior to briefing on the substance

---

[17]     *See In re Dakota K.*, ___ P.3d ___, Op. No. 7041 at 8-10, 2015 WL 5061844, at *3-4 (Alaska Aug. 28, 2015). Though *Dakota K.* had not been decided before Reid's briefings and oral argument, our holding in *Dakota K.*, setting forth appellant's burden to demonstrate that the commitment he is challenging is his first commitment would not have affected the outcome of this case: The record shows that Reid faced a 30-day commitment in August 2013 and a subsequent 90-day commitment in October 2013, and thus it is now irrelevant whether his August 2013 commitment was his first.

[18]     156 P.3d 371, 380 (Alaska 2007).

of the appeal. It is thus the best practice for the State to move to dismiss appeals of commitment orders as moot before briefing commences when no mootness exception is readily apparent.[19] Therefore, when the State first receives a notice of appeal of an expired commitment order that does not otherwise present a live controversy, if it believes that the claims are moot under *Wetherhorn*[20] it should move to dismiss the appeal as moot prior to briefing. The person challenging the commitment then has the burden to demonstrate whether a mootness exception exists before briefing underlying substantive issues. We can then either determine whether there is a live controversy prior to briefing on the substantive issues or deny the State's motion without prejudice to the parties' ability to further develop and discuss mootness in their subsequent briefing.

This procedure has the potential to save scarce public attorney and judicial resources by avoiding merits-based briefing when appeals must ultimately be dismissed on procedural mootness grounds. Moreover, it puts the appellant in the best position to prove facts regarding whether the commitment is his first or whether any other mootness exception applies, and it gives the State an opportunity to rebut those claims. Otherwise, if the State waits until its appellee's brief to raise mootness issues, it will be unable to respond to any claims the appellant makes in its reply brief. We hope that setting out

---

[19]     *Cf. Dakota K.*, Op. No. 7041 at 9-10, 2015 WL 5061844, at *4 (holding that if a patient "files an appeal challenging the commitment order on sufficiency of evidence grounds, the State can file a motion to dismiss based on mootness, and the respondent would then have the burden of making some evidentiary showing either that this was the first involuntary commitment or that there is some other factual basis for claiming collateral consequences").

[20]     This court can stay the normal briefing schedule as soon as a motion to dismiss is filed.

these best practices will allow all parties to address and focus on the multiple dimensions of an appeal of a commitment order in a more efficient and complete manner.

## V.    CONCLUSION

Because Reid's appeal is moot and not subject to the collateral consequences or public interest exceptions to the mootness doctrine, the appeal is DISMISSED AS MOOT.