*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Necessity for the Hospitalization of<br><br>NAOMI B. | ) ) ) ) ) ) ) | Supreme Court Nos. S-15859/16467 (Consolidated)<br><br>Superior Court No. 3AN-15-00204 PR |
| | ) | O P I N I O N |
| | ) | |
| In the Matter of the Necessity for the Hospitalization of<br><br>LINDA M. | ) ) ) ) ) ) ) ) | No. 7328 – January 11, 2019<br><br>Superior Court No. 3AN-16-01656 PR |

Appeal in File No. S-15859 from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, John Suddock, Judge. Appeal in File No. S-16467 from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Mark Rindner, Judge.

Appearances: Rachel Cella, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant Naomi B. James B. Gottstein, Law Project for Psychiatric Rights, Inc., Anchorage, for Appellant Linda M. Joanne M. Grace and Laura Fox, Assistant Attorneys General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee State of Alaska.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

STOWERS, Chief Justice, and CARNEY, Justice.
BOLGER, Justice, concurring.

# I.    INTRODUCTION

We are presented with two separate appeals from involuntary commitment orders, brought by two appellants, one of whom also appeals a related involuntary medication order.  The challenged orders expired while the respective appeals were pending; we consolidated the cases for briefing on whether to revisit our mootness jurisprudence in involuntary commitment and involuntary medication appeals.  We now hold that all appeals of involuntary admissions for treatment and involuntary medication are categorically exempt from the mootness doctrine.  After reviewing each case on its merits and finding no error in the orders appealed, we affirm.

# II.    FACTS AND PROCEEDINGS

## A.    Naomi B.[1]

In January 2015 Adult Protective Services petitioned for an ex parte order committing Naomi B. to the Alaska Psychiatric Institute (API).  She agreed to stay voluntarily and to take medication, attend groups and meetings, and plan for her discharge.  But after her admission she refused to take medication or participate in treatment.

Naomi's state soon worsened.  She reported being repeatedly raped, hit, and assaulted, but API found no evidence to support her allegations after conducting a physical exam and reviewing tapes from the facility's surveillance cameras.  Her treating psychiatrist, Dr. David Mack, concluded that Naomi's reports were delusions caused by mental illness, and he diagnosed her with schizoaffective disorder, bipolar subtype.

---

[1]    Pseudonyms have been used throughout this opinion to protect the privacy of the parties.

Naomi never demanded to be discharged from API, and while she ate and maintained her personal hygiene, she could not or would not cooperate with API staff to plan for her discharge. Concerned that she could not manage her treatment or housing outside of API, hospital staff filed a petition later that month to involuntarily commit Naomi for 30 days. The petition alleged that Naomi was "gravely disabled and there [was] reason to believe that [her] mental condition could be improved by the course of treatment sought." API also petitioned the court to approve involuntary administration of psychotropic drugs.

That same day a magistrate judge held hearings on both petitions. Naomi was represented by an attorney at the hearings, but declined to participate in person. The court visitor[2] testified that Naomi had refused to meet with her, that she was therefore unable to offer an opinion about Naomi's capacity to give informed consent to medication, and that she had been unable to find any advance health care directive in Naomi's medical records.[3]

The court next addressed the involuntary commitment petition. Dr. Mack testified that outpatient treatment would not be adequate for Naomi because she was "at great risk for exposure to disorganized, aggressive behaviors if she's not surround[ed] by a professional staff." Dr. Mack also indicated that Naomi was "unable to engage with [API's] treatment team on basic needs due to her delusional construct" and that API had not been able to confirm that Naomi had a safe place to live. As a result he believed

---

[2]     When an involuntary medication petition is filed, the superior court is required to appoint an independent court visitor to assist in investigating whether a patient has capacity to give or withhold informed consent to the administration of psychotropic medication. AS 47.30.839(d).

[3]     An advance health care directive could have indicated Naomi's position regarding psychotropic medication. *See* AS 47.30.839(d)(2).

there was no less restrictive placement where Naomi could receive treatment. The court granted the petition, finding that Naomi was "mentally ill and, as a result, gravely disabled," and that there was no less restrictive treatment alternative.

The court then turned to the petition for court approval of administration of psychotropic medication. Dr. Mack testified that API sought to administer two medications to Naomi: olanzapine, an antipsychotic to address her delusions, and lorazepam to reduce anxiety and irritability and to treat some side effects of olanzapine. Dr. Mack acknowledged risks associated with both medications but concluded that the benefits outweighed the risks. He hoped that the medications could improve Naomi's condition within a week. He believed that Naomi had no ability to give or withhold informed consent to the administration of the medications, that the medications were in her best interests, and that there was no less intrusive means of treating Naomi's schizoaffective disorder. He also said that Naomi would be offered various forms of group treatment to help her manage her illness, but that the group therapies alone would not successfully treat Naomi's disorder. The court granted the petition for medication "with the amendment that the lorazepam [was to be administered] only as needed."

Naomi's lawyer did not question witnesses, raise objections, or make any arguments to the court.

The magistrate judge issued a written report detailing the factual and legal findings from the hearing; the superior court adopted the magistrate judge's recommended findings and signed the attached orders in February.

Naomi appeals, arguing that the superior court erred in finding that she was gravely disabled, that there was no less intrusive alternative to involuntary medication, and that forced medication was in her best interests. Naomi requests that we reverse or vacate the commitment and medication orders.

**B.      Linda M.**

Linda M. has a history of mental health issues spanning most of her adult life.  By 2016 she had exhibited paranoia and aggressive behavior, such as spitting at people, and kicking and throwing things.  The Anchorage Police Department's crisis intervention team responded several times to calls from Linda's mother reporting that Linda was threatening her.  The police described Linda as "agitated" and "very volatile," and they eventually arrested Linda for threatening her mother with a shovel and spitting on her.  At the time Linda was already facing a criminal charge for reckless driving in connection with a car accident.

While in custody for the two criminal cases, Linda was sent to API for an evaluation and restoration of her competency to stand trial.  In July 2016 API filed a petition to commit Linda for 30 days.  During the commitment hearing, Linda's testimony seemed paranoid and delusional, including statements that members of a drug cartel had attempted to poison her; a psychiatric nurse practitioner testified that Linda had schizophrenia.  The court found that Linda had a mental illness and as a result posed a "substantial risk of harm to others."  It granted API's petition to commit Linda for up to 30 days.  During her commitment, Linda voluntarily participated in therapy, but she also swore, lunged, and swung at various API staff members, raising concerns about her unpredictability and aggressive behavior.  The therapy did not lead to improvement, and the efficacy of the drugs administered by API remained unclear.

In August 2016 API filed a petition to commit Linda for another 90 days and Linda requested a jury trial.  During the trial Linda offered further testimony reflecting paranoid delusions.  The jury unanimously found by clear and convincing evidence that Linda was mentally ill and that as a result she was "likely to cause harm to others."

Approximately one week after the jury verdict, the superior court held an evidentiary hearing on whether there was any less restrictive alternative to hospitalization at API. Various experts testified and several alternatives were explored. An API mental health clinician who was certified as an expert in API discharge planning testified that, because Linda was not taking medication as prescribed, she would not be accepted into a publicly funded assisted living home. The clinician also testified that a halfway house for formerly incarcerated individuals would not be appropriate for Linda, even in conjunction with a community support program, and that privately operated assisted living facilities would likely reject Linda because of her unpredictability and aggressiveness. An API psychiatric nurse practitioner similarly testified that Linda needed to be stabilized using medication at API before her release, that she still needed "24/7 . . . supervision," and that releasing Linda into the community at that time would set her up for failure.

Finally, a clinical psychiatrist testified that Linda could be discharged to an outpatient community support program if safe housing could also be arranged for her, such as an assisted living facility or other location with professional staff that could "retain her" if she became agitated. He also discussed a closed facility, Soteria-Alaska, as a less restrictive alternative to API. He testified that Soteria-Alaska had operated for seven years in Anchorage and had offered an alternative to the psychiatric inpatient hospitalization offered at API, but one that still provided "24/7" supervision. But he testified that Soteria-Alaska was shut down due to funding issues. He opined Soteria-Alaska would have been a good option for Linda if it were still in operation.

Linda's counsel asserted during closing argument that the evidence had not established a high probability that a less restrictive alternative would be unsuccessful. Counsel also argued that Linda "ha[d] the constitutional right to a Soteria-like setting."

More specifically, counsel argued that "the state cannot de-fund Soteria-Alaska and then say that because we haven't funded it, there is no less-restrictive alternative."

The superior court determined that, given the jury finding that Linda was likely to cause harm to others, "a less restrictive alternative would have to . . . protect others from physical injury." The court reasoned that "none of the less restrictive alternatives that have been proposed by [Linda] or would otherwise be available will protect . . . the public from the danger to others that [Linda] currently [poses]." The court explained that when Linda becomes agitated, it happens quickly, and that no less restrictive alternative was sufficient to protect the public "other than a facility like API that is locked and [that] provides 24/7 care." Finally, with regard to Soteria-Alaska as a proposed alternative, the court stated, "I reject the idea that there's a constitutional right that would require the state to fund particular kinds of programs. There would be separation of powers issues, I believe."

The superior court found that there was no less restrictive alternative to commitment at API. Linda appeals, arguing that the court erred by rejecting Soteria-Alaska as a feasible less restrictive alternative, and that her commitment order therefore violated her constitutional right not to be hospitalized where a feasible less restrictive alternative exists. She requests that we reverse and vacate the 90-day commitment order.

## III. STANDARD OF REVIEW

"We apply our independent judgment to issues of mootness because as a matter of judicial policy, mootness is a question of law."[4] We review the superior court's factual findings in involuntary commitment or medication proceedings for clear error and reverse those findings only if we have a "definite and firm conviction that a mistake has

---

[4]     *In re Tracy C.*, 249 P.3d 1085, 1089 (Alaska 2011) (quoting *Clark v. State, Dep't of Corr.*, 156 P.3d 384, 386 (Alaska 2007)); *see also In re Jacob S.*, 384 P.3d 758, 764 (Alaska 2016).

been made."[5]  However, whether those findings meet the statutory requirements for involuntary commitment or medication is a question of law to which we apply our independent judgment.[6]  The independent-judgment standard also applies to questions regarding the interpretation of constitutional and statutory provisions, adopting "the rule of law that is most persuasive in light of precedent, reason, and policy."[7]

## IV.  DISCUSSION

### A.  We Will Consider The Merits Of Naomi's And Linda's Appeals Because We Hold That The Public Interest Exception Applies To All Appeals From Involuntary Admission For Treatment.

As typically happens in involuntary admission for treatment appeals, Naomi's and Linda's commitment orders and Naomi's medication order expired while their appeals were pending.  Under our prior ruling in *Wetherhorn v. Alaska Psychiatric Institute*, this would render their appeals moot.[8]  In its initial briefing in Naomi's case, the State argued that Naomi's case should be dismissed as moot.  Naomi argued that her case fell under both the public interest exception to the mootness doctrine[9] and the

---

[5]    *In re Jacob S.*, 384 P.3d at 763-64 (quoting *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375 (Alaska 2007)).

[6]    *Id.* at 764 (citing *Wetherhorn*, 156 P.3d at 375).

[7]    *Id.* (quoting *Wetherhorn*, 156 P.3d at 375).

[8]    156 P.3d at 380-81  (holding appeal of commitment order moot as 30-day commitment period had ended).

[9]    *See In re Heather R.*, 366 P.3d 530, 532 (Alaska 2016) (applying public interest exception to reach merits of due process challenge to expired evaluation order); *see also In re Daniel G.*, 320 P.3d 262, 267-68 (Alaska 2014) (applying public interest exception to due process challenge to ex parte 72-hour involuntary evaluation order). An otherwise moot claim may be considered under the public interest exception if:  (1) "the disputed issues are capable of repetition"; (2) applying the mootness doctrine "may
(continued...)

collateral consequences exception.[10]  She also argued, alternatively, that merit-based review of commitment appeals was mandated by federal due process concerns and that she had a statutory right to appeal under AS 47.30.765.[11]  We rejected this statutory argument in *In re Mark V.* (*Mark V. I*),[12] but Naomi argued that we should overrule that decision.

In Linda's case the State suggested that we could consider the merits of Linda's case under the public interest exception.  Linda agreed that we should do so, or, alternatively, that we should revisit our mootness jurisprudence in the involuntary commitment context and hear all appeals of psychiatric confinement orders on the merits. We consolidated the two cases on appeal and asked all parties for supplemental briefing on whether — and if so, how — we should revisit our case law on moot involuntary commitment and medication appeals.

---

[9]  (...continued)
cause review of the issues to be repeatedly circumvented"; and (3) the issues "are so important to the public interest as to justify overriding the mootness doctrine." *Heather R.*, 366 P.3d at 532 (quoting *Wetherhorn*, 156 P.3d at 380-81).

[10]  *See In re Joan K.*, 273 P.3d 594, 597-98 (Alaska 2012) ("[T]he collateral consequences doctrine 'allows courts to decide otherwise-moot cases when a judgment may carry indirect consequences in addition to its direct force, either as a matter of legal rules or as a matter of practical effect.' "(quoting *Peter A. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 146 P.3d 991, 994-95 (Alaska 2006))).  Our application of the collateral consequences exception in *Joan K.* was limited to appeals from a person's first involuntary commitment order. *Id.* at 598.

[11]  AS 47.30.765 provides:  "The respondent has the right to an appeal from an order of involuntary commitment.  The court shall inform the respondent of this right."

[12]  324 P.3d 840, 847-48 (Alaska 2014).

We do not lightly overturn our previous decisions. After reexamining our decisions regarding the mootness doctrine as applied to cases involving involuntary admission for treatment and medication, and in light of the broad agreement in the supplemental briefing regarding the practical consequences that have followed from those decisions — discussed in more detail below — we are persuaded that our previous rulings with regard to mootness in these contexts were mistaken and that more good than harm will come from overturning them.

1.    **Mootness in commitment appeals — *Wetherhorn* and its progeny**

A history of our mootness jurisprudence is useful for context. Although the legislature amended Alaska's mental health statutes in 1981 in response to a nationwide shift in mental health treatment,[13] we heard few appeals from such cases until more than 20 years later. In 2007, in *Wetherhorn v. Alaska Psychiatric Institute*, we considered a constitutional challenge to the statutory definition of "grave disability" and a due process challenge to the proceedings in which the appellant was involuntarily committed to API for 30 days.[14] The appellant also challenged the sufficiency of the evidence underlying her commitment, but we declined to consider that challenge because the commitment period had "long since passed," rendering the question moot.[15] We considered but declined to apply the public interest exception, reasoning that "Wetherhorn was committed based on a specific set of facts," that "[i]f it were to become necessary to seek Wetherhorn's commitment again, the hearing would be based on a different set of facts specific to different circumstances," and that "factual questions are not capable of

---

[13]    Ch. 84, § 1, SLA 1981.

[14]    156 P.3d at 375-80.

[15]    *Id.* at 380-81.

repetition."[16] *Wetherhorn* thus established that appeals from commitment orders are moot when the appellant has already been released before the appeal is heard and that the public interest exception would apply only to generally applicable questions of law and not to questions of fact like sufficiency-of-the-evidence challenges.

Our 2012 opinion in *In re Joan K.* departed from the strict holding of *Wetherhorn* and adopted a "collateral consequences exception" to the mootness doctrine in involuntary commitment appeals.[17]  The appellant in that case noted that several other jurisdictions had applied the collateral consequences exception to involuntary commitment appeals on the basis of, for example, "social stigma, adverse employment restrictions, application in future legal proceedings, and restrictions on the right to possess firearms."[18]  We concluded "that there are sufficient general collateral consequences, without the need for a particularized showing, to apply the doctrine in an otherwise-moot appeal from a person's first involuntary commitment order."[19]  Because *Joan K.* involved the appellant's first involuntary commitment, we reviewed the merits of her evidentiary challenges.[20]  But we also "note[d] that some number of prior involuntary commitment orders would likely eliminate the possibility of additional

---

[16]     *Id.* at 381.

[17]     273 P.3d 594, 596-98 (Alaska 2012).

[18]     *Id.* at 597 (footnotes omitted) (first citing *In re Alfred H.H.*, 910 N.E.2d 74, 84 (Ill. 2009); *State v. Lodge*, 608 S.W.2d 910, 912 (Tex. 1980); *State v. J.S.*, 817 A.2d 53, 55-56 (Vt. 2002); then citing *Alfred H.H.*, 910 N.E.2d at 84; then citing *Alfred H.H.*, 910 N.E.2d at 84; *In re Hatley*, 231 S.E.2d 633, 634-35 (N.C. 1977); and then citing *In re Walter R.*, 850 A.2d 346, 349 (Me. 2004)).

[19]     *Id.* at 598.

[20]     *Id.* at 598-602.

collateral consequences, precluding the doctrine's application."[21] To illustrate the point, we cited *Bigley v. Alaska Psychiatric Institute*, which described a " 'revolving door' pattern of arrest, hospitalization, release and relapse" in which the appellant had been admitted to API at least 68 times.[22] We did not, however, explicitly limit the collateral consequences exception to an appellant's first involuntary commitment or specify what number of prior commitments would render further collateral consequences negligible.

*Joan K.* also cursorily presented the question whether AS 47.30.765, which provides that the respondent to an involuntary commitment petition "has the right to an appeal from an order of involuntary commitment," supersedes the mootness doctrine in this context.[23] Because we adopted and applied the collateral consequences exception, we did not reach this question, but we expressed some skepticism.[24] We addressed this issue two years later in *Mark V. I*.[25] There we noted that other statutes also provide "rights of appeal equivalent to those provided by AS 47.30.765"[26] and that "[t]he existence of these statutes ha[d] not in practice compelled us to review otherwise-moot

---

[21]     *Id.* at 598.

[22]     *Id.* at 598 n.18 (citing *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 172-73 (Alaska 2009)).

[23]     *Id.* at 597.

[24]     *Id.* ("Although Joan's interpretation of the statute as overriding the judicial policy of not deciding moot cases appears overbroad, we do not need to address this argument . . . .").

[25]     324 P.3d 840, 847-48 (Alaska 2014).

[26]     *Id.* at 847 (first citing AS 47.10.080(i) (right to appeal judgments in child-in-need-of-aid proceedings); then citing AS 22.05.010(c) (right to appeal administrative agency decisions to the superior court); AS 22.07.020(d) (providing that "[a]n appeal to the court of appeals is a matter of right in all actions and proceedings within its jurisdiction")).

appeals."[27] We concluded the statute did not "requir[e] appellate review of a moot civil commitment dispute."[28]

Our opinion in *In re Dakota K.* addressed the question — left unresolved by *Joan K.* — of which party bears the burden to show the existence or non-existence of collateral consequences.[29] We concluded that the party opposing mootness bears "the burden to establish the fact of collateral consequences."[30] Because the appellant in that case had not made a showing or even alleged that the challenged involuntary commitment was his first or that any other collateral consequences applied, we dismissed the appeal as moot.[31]

That same year we addressed a procedural issue concerning mootness in *In re Reid K.*[32] We recognized that because the mootness issue was first addressed in the State's appellee's brief, the appellant had not had a chance to demonstrate that his claims were not moot or that they fell within a mootness exception doctrine until the reply brief.[33] To remedy this procedural hurdle, we suggested that it would be "best practice

---

[27]     *Id.* at 847-48.

[28]     *Id.* at 848.

[29]     354 P.3d 1068, 1071-72 (Alaska 2015).

[30]     *Id.* at 1072-73.

[31]     *Id.* at 1073.

[32]     357 P.3d 776, 782-83 (Alaska 2015).

[33]     *Id.* at 782.  This is problematic because, under Alaska Appellate Rule 212, a reply brief is limited to 20 pages and must be filed within 20 days after service of the appellee's brief.  Where mootness is raised for the first time in the appellee's brief, this could make it difficult for the appellant to address the issue in full within the time and space restrictions of a reply brief without forgoing substantive arguments.

for the State to move to dismiss appeals of commitment orders as moot before briefing commences when no mootness exception is readily apparent."[34] We explained that this procedure might "save scarce public attorney and judicial resources by avoiding merits-based briefing" in cases that would ultimately be dismissed as moot.[35]

### 2. Our mootness jurisprudence has proved unworkable in practice.

In their supplemental briefing the parties agree that over the past decade, our mootness jurisprudence as applied to involuntary commitment and medication appeals has resulted in significant time and effort spent addressing mootness issues. Counsel for both the State and Naomi indicate that in commitment appeals, briefing and litigating mootness is often more time- and resource-consuming than addressing the actual merits of any particular case. The State argues that "[t]he collateral consequences exception can be particularly difficult to litigate because its applicability can hinge on facts that may not be in the appellate record."

The procedure we laid out in *Reid K.* for a pre-briefing motion to dismiss on mootness grounds was not used in either of these cases. Naomi's attorney, a public defender, indicates that "in appeals involving the Public Defender Agency, it does not appear that the *Reid K.* [procedure] has been utilized at all." The State concedes that it has not effectively implemented the *Reid K.* procedure, noting that it can be difficult to determine if the issues raised on appeal would fall within a mootness exception before the appellant's arguments are articulated in the opening brief. Naomi further argues that even if the *Reid K.* procedure had been used, addressing the potential applicability of a mootness exception "entails reviewing the record, researching the relevant issues, and

---

[34] *Id.*

[35] *Id.* at 783.

filing a detailed response to the dismissal motion that is not unlike a merits-based brief." Thus, she argues, if a mootness exception even arguably applies, using the *Reid K.* procedure merely "shifts resources to an earlier stage in the case but does not meaningfully save them."

A review of our past and pending cases also indicates that mootness has dominated appeals in the involuntary commitment context: as of February 2018 — when we heard oral arguments on this issue — all but three of our prior decisions in post-*Wetherhorn* commitment appeals directly addressed, to some extent, whether the commitment appeal was moot.[36] Similarly, of the commitment cases pending before us that had been fully briefed at that time, almost all included briefing on mootness.

We have consistently held that we will not reconsider prior rulings without compelling reasons for doing so: "We will overrule a prior decision only when clearly convinced that the rule was originally erroneous or is no longer sound because of changed conditions, and that more good than harm would result from a departure from

---

[36] *See In re Mark V.* (*Mark V. II*), 375 P.3d 51, 55-56 (Alaska 2016); *In re Heather R.*, 366 P.3d 530, 532 (Alaska 2016); *In re Reid K.*, 357 P.3d at 780-83; *In re Dakota K.*, 354 P.3d at 1070-73; *Mark V. I*, 324 P.3d 840, 843-48 (Alaska 2014); *In re Daniel G.*, 320 P.3d 262, 267-69 (Alaska 2014); *In re Stephen O.*, 314 P.3d 1185, 1191-92 (Alaska 2013); *In re Jeffrey E.*, 281 P.3d 84, 86 (Alaska 2012); *In re Joan K.*, 273 P.3d 594, 596-98 (Alaska 2012); *In re Tracy C.*, 249 P.3d 1085, 1089-91 (Alaska 2011); *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 179 (Alaska 2009); *E.P. v. Alaska Psychiatric Inst.*, 205 P.3d 1101, 1106-08 (Alaska 2009); *Wayne B. v. Alaska Psychiatric Inst.*, 192 P.3d 989, 990-91 (Alaska 2008); *Maness v. Daily*, 184 P.3d 1, 7-8 (Alaska 2008).

The outliers are *Wetherhorn v. Alaska Psychiatric Institute*, 167 P.3d 701 (Alaska 2007), which addressed only an attorney's fee dispute arising out of the first *Wetherhorn* case, and two cases where we addressed the challenged involuntary commitment without discussing mootness, but still considered whether a related involuntary medication appeal was moot. *In re Jacob S.*, 384 P.3d 758, 769-70 (Alaska 2016); *In re Gabriel C.*, 324 P.3d 835, 837-40 (Alaska 2014).

precedent."[37]  We have recognized that our precedent may be overturned as "originally erroneous" if it has "prove[d] to be unworkable in practice."[38]

As we explained in *Dakota K.*, "[m]ootness is a judicially created doctrine meant to promote expediency and judicial economy."[39]  Our mootness jurisprudence has failed to achieve these goals:  more, rather than fewer, resources of public attorneys and the court have been spent litigating mootness since *Wetherhorn*, with few if any corresponding savings in resources spent on merits-based briefing.

In light of these factors it is clear to us that our current mootness jurisprudence, as it applies to the involuntary commitment context, has indeed proved to be unworkable in practice.  But that does not answer the question of what a more appropriate rule would be.  To answer that, we need to reconsider our mootness jurisprudence in more detail.

### 3. The public interest exception is categorically applicable to involuntary commitment appeals.

As explained above, we will hear an otherwise moot case where it falls under the public interest exception to mootness.  The State suggests that the public interest exception may always be applicable to justify appellate review of involuntary commitment orders.  As we have applied it, the public interest exception depends on three factors:  "(1) whether the disputed issues are capable of repetition, (2) whether the mootness doctrine, if applied, may cause review of the issues to be repeatedly

---

[37]    *Thomas v. Anchorage Equal Rights Comm'n*, 102 P.3d 937, 943 (Alaska 2004) (quoting *State, Commercial Fisheries Entry Comm'n v. Carlson*, 65 P.3d 851, 859 (Alaska 2003)).

[38]    *Khan v. State*, 278 P.3d 893, 901 (Alaska 2012) (quoting *Thomas*, 102 P.3d at 943).

[39]    354 P.3d at 1070.

circumvented, and (3) whether the issues presented are so important to the public interest as to justify overriding the mootness doctrine."[40]

The second factor will always favor applying the exception in involuntary commitment appeals: as we explained in *E.P. v. Alaska Psychiatric Institute*, "[i]t is quite unlikely that an appeal from a 30-day or 90-day commitment, or even a 180-day commitment, could be completed before the commitment has expired."[41] And we have repeatedly held that some issues in involuntary commitment appeals are important to the public interest — the third factor — because an involuntary commitment is a "massive curtailment of liberty."[42]

Where we have considered the public interest exception in the past, we have generally held that disputed questions are not "capable of repetition" when they "turn on unique facts unlikely to be repeated."[43] In some cases we have applied this rule strictly. For example, in *Wetherhorn* we concluded that the public interest exception did not apply because "Wetherhorn was committed based on a specific set of facts."[44] Similarly, in *In re Reid K.* we concluded that a sufficiency-of-the-evidence challenge based on the

---

[40]     *Wetherhorn*, 156 P.3d at 380-81 (quoting *Akpik v. State, Office of Mgmt. & Budget*, 115 P.3d 532, 536 (Alaska 2005)).

[41]     205 P.3d at 1107; *see also Joan K.*, 273 P.3d at 608 (Stowers, J., dissenting) ("[I]t is practically impossible to perfect an appeal of an order that by its terms will expire in 30 days.").

[42]     *Wetherhorn*, 156 P.3d at 375 (quoting *Humphrey v. Cady*, 405 U.S. 504, 509 (1972)); *accord In re Tracy C.*, 249 P.3d 1085, 1090 (Alaska 2011) (quoting *E.P.*, 205 P.3d at 1107).

[43]     *E.P.*, 205 P.3d at 1107; *see also Tracy C.*, 249 P.3d at 1094 ("[T]he public interest exception to the mootness doctrine applies because Tracy presents a question of statutory interpretation that is capable of repetition.").

[44]     156 P.3d at 381.

alleged unreliability of clinical tests presented as evidence did not fall under the public interest exception because "the trial court is the most appropriate forum in which to evaluate and weigh competing fact-based arguments regarding the reliability of evidence."[45]

However, in other cases we have applied the "capable of repetition" element more flexibly. For example, in *E.P.* the appellant raised both legal and factual challenges to his commitment order.[46] The latter included the question whether E.P. — whose history of alcohol and inhalant abuse had resulted in organic brain damage, dementia, personality disorder, and psychosis[47] — met the statutory requirements for involuntary commitment.[48] We concluded that "E.P.'s fact-based claims are capable of repetition to any addict whose substance abuse causes organic brain damage," even if the abused substance were something other than inhalants.[49]

On re-examination, we are persuaded that the "capable of repetition" element should be applied broadly in the context of involuntary commitment appeals, and that a case need not be capable of being repeated *identically* in order for the public interest exception to apply. Although every involuntary commitment proceeding is based on a particular set of facts, such proceedings occur frequently, and it is not uncommon for similar fact patterns to reoccur, either in a subsequent proceeding

---

[45]    357 P.3d 776, 781 (Alaska 2015).

[46]    205 P.3d at 1107.

[47]    *Id.* at 1103-04.

[48]    *Id.* at 1107.

[49]    *Id.*

involving the same respondent,[50] or in a different case entirely.[51] Accordingly, an opinion considering whether a commitment order in one case was supported by sufficient evidence will likely be useful as guidance by analogy to future commitment proceedings. By contrast, declining review of commitment appeals based on mootness effectively deprives trial courts of guidance on how to apply the statutory requirements to the facts of individual cases.

We conclude that appeals from involuntary commitment orders are categorically subject to the public interest exception, whether the appeal is premised on a question of statutory or constitutional interpretation or on an evidence-based challenge. While we reaffirm that the trial court is indeed the correct forum for evaluating and weighing the reliability and credibility of evidence[52] and we therefore will not second-guess the trial court's findings of fact where they are supported by evidence in the record, that does not preclude us from considering whether the findings were clearly erroneous or whether they were sufficient to satisfy legal requirements.

---

[50] *See id.* (noting that the circumstances underlying E.P.'s commitment "were not only capable of repetition . . . , but they were repeated, because E.P. was committed three times on the same facts").

[51] *Compare Mark V. II*, 375 P.3d 51, 54 (Alaska 2016) (respondent was found "gravely disabled" because of paranoid schizophrenia causing delusions and bizarre behavior), *with Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 172-73 (Alaska 2009) (same); *and compare In re Jacob S.*, 384 P.3d 758, 762-63 (Alaska 2016) (respondent was found a danger to others after paranoid delusions caused him to attack his neighbor and attempt to set her house on fire on multiple occasions), *with In re Reid K.*, 357 P.3d 776, 777-78 (Alaska 2015) (respondent was found "likely to cause harm to himself or others" after acting on hallucinations instructing him to harm and kill others).

[52] *See Reid K.*, 357 P.3d at 781.

**4.     The public interest exception is also categorically applicable to involuntary medication appeals.**

Just like involuntary commitment proceedings, involuntary medication proceedings implicate "fundamental constitutional guarantees of liberty and privacy."[53] And medication petitions are virtually always filed in conjunction with a petition for involuntary commitment, with hearings on the two petitions often taking place before the same judge on the same day. As with involuntary commitment appeals, because "it is doubtful that an appeal from a medication order could ever be completed within the order's period of effectiveness,"[54] such cases are likely to routinely evade timely review.

We have previously held that the public interest exception applies "in order to clarify the requirements for protecting constitutional rights in [involuntary medication] proceedings."[55] Although every involuntary medication order is of course based on the facts and circumstances of a particular case, similar fact patterns are likely to reoccur. By continuing to apply the mootness doctrine to involuntary medication appeals, we deprive litigants and the superior court of helpful guidance in applying the statutory framework. We therefore also conclude that the public interest exception categorically

---

[53]     *Bigley*, 208 P.3d at 179 (quoting *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 250 (Alaska 2006)). We observed in *Myers*: "Side effects aside, the truly intrusive nature of psychotropic drugs may be best understood by appreciating that they are literally intended to alter the mind. Recognizing that purpose, many states have equated the intrusiveness of psychotropic medication with the intrusiveness of electroconvulsive therapy and psychosurgery." 138 P.3d at 242 (footnote omitted) (first citing *Riggins v. Nevada*, 504 U.S. 127, 134 (1992); then citing *Jarvis v. Levine*, 418 N.W.2d 139, 146 (Minn. 1988); *In re K.K.B.*, 609 P.2d 747, 749 (Okla. 1980)).

[54]     *Myers*, 138 P.3d at 245.

[55]     *Bigley*, 208 P.3d at 179 (citing *Myers*, 138 P.3d at 244).

applies to involuntary medication appeals, and we will hear all such appeals on the merits.[56]

### 5. Overturning our mootness jurisprudence would result in more good than harm.

Now that we have identified a new and better approach to mootness in the involuntary commitment and medication contexts, we must turn to the second requirement to depart from stare decisis, which dictates we "balance the benefits of adopting a new rule against the benefits of stare decisis."[57] The benefits of reaching the merits of involuntary commitment appeals were articulated in the dissenting opinion to *In re Joan K.*:

> Of first importance, the citizen's liberty has been alleged to have been wrongfully taken by court process; the court should afford the citizen the opportunity to prove the error and, if proven, obtain judicial acknowledgment that the order was erroneously issued. Giving the citizen this opportunity will assure the citizen that she will be heard, and that if a lower court has erred, that error will not go unnoticed or unremedied, at least to the extent that the erroneous order will be reversed and vacated. Public confidence in the judicial branch demands that we hold ourselves accountable.
>
> Second, in this age of prevalent information mining, collection, and storage into increasingly large, interconnected, and searchable data banks, the fact that a citizen has been involuntarily committed to a mental institution will

---

[56] We agree with the concurrence's disavowal of *Mark V.*'s limitation of the collateral consequences exception to appeals of a first commitment order; however, we are unpersuaded by its criticism of the public interest exception's categorical application to involuntary admission for treatment appeals. The magnitude of the interest at stake in these cases — the deprivation of liberty — removes them from the concurrence's concern that this exception will be applied to "routine cases."

[57] *State v. Carlin*, 249 P.3d 752, 761 (Alaska 2011).

follow that individual for all of her life. She should be given the means to effectively challenge that order through appeal regardless of the fact that by the time her appeal is ripe for decision, the 30 days will have long since expired and she will have been released from State custody. The injury inflicted by an erroneously issued order of involuntary commitment "lives" until the wrong is righted.[58]

The same reasoning applies to involuntary medication appeals.

On the other side of the scales are the benefits of stare decisis: "providing guidance for the conduct of individuals, creating efficiency in litigation by avoiding the relitigation of decided issues, and maintaining public faith in the judiciary."[59] Declining to decide such appeals on mootness grounds provides no guidance to the general public, and little to no guidance to litigants and the superior court in involuntary commitment and medication proceedings. On the contrary, as suggested earlier, our mootness jurisprudence may in fact have deprived the superior court of guidance in how to apply the civil commitment and forced medication statutes to the facts of individual cases.

Second, as discussed above, although our intent was to promote efficiency in litigation, experience has shown that this has not happened. Because the mootness doctrine as we have applied it depends on the specific circumstances and arguments raised on appeal, it has instead caused repeated extended litigation over mootness rather than over the actual merits of a case.

Finally, we conclude that to the extent public faith in the judiciary may be harmed by our change of direction in this case, the risk is vastly outweighed by holding the judiciary as a whole accountable through merit-based review of involuntary commitment and medication orders.

---

[58]     273 P.3d 594, 607-08 (Alaska 2012) (Stowers, J., dissenting).

[59]     *Carlin*, 249 P.3d at 761-62.

**6. We will hear all involuntary admission for treatment and involuntary medication appeals on the merits.**

For these reasons, we conclude that the public interest exception applies categorically to appeals from orders for involuntary admission for treatment and involuntary medication.[60] We will hear such cases on their merits even where the underlying order has expired and the respondent has been released or no longer subject to forced medication.[61]

Because we conclude that all involuntary admission for treatment and medication appeals are subject to the public interest exception, it is not necessary for us to reconsider whether AS 47.30.765 mandates judicial review of otherwise-moot cases, and we decline to do so; we similarly do not address Naomi's argument that judicial review on the merits of commitment appeals is mandated by federal due process concerns. But to the extent that our prior decisions on mootness in the involuntary admission for treatment and medication contexts are inconsistent with this opinion, they are overruled. We emphasize that because our decision here is based on circumstances

---

[60] We note that this holding is not limited to the kinds of involuntary commitment and involuntary medication appeals that Naomi and Linda bring here; rather, it covers appeals of any order for involuntary hospitalization or treatment in the mental health context. We have previously applied the public interest exception to at least one other type of involuntary hospitalization appeal: a due process challenge to an order authorizing up to 72 hours' confinement for psychiatric evaluation pursuant to AS 47.30.715. *See In re Heather R.*, 366 P.3d 530, 532 (Alaska 2016); *In re Daniel G.*, 320 P.3d 262, 268 (Alaska 2014). We hold today that regardless of the type of involuntary admission or medication proceeding being challenged or the legal basis for appeal, the public interest exception authorizes us to consider any such appeal on the merits.

[61] The parties in future commitment and medication appeals need not brief the application of the mootness doctrine or its exceptions, and there is no need for parties in superior court proceedings to address collateral consequences for purposes of making a record for appellate review.

unique to appeals from involuntary admission and medication proceedings, our ruling here is limited to such cases and should not be construed as altering in any way our approach to mootness in other contexts.

**B.    The Superior Courts Did Not Err In Granting API's Commitment Petitions For Naomi And Linda.**

Like the United States Supreme Court, we have characterized involuntary commitment for a mental illness as a "massive curtailment of liberty" that demands due process of law.[62]  We have also recognized that constitutional rights "extend 'equally to mentally ill persons' so that the mentally ill are not treated 'as persons of lesser status or dignity because of their illness.' "[63]  Under both the U.S. Constitution and the Alaska Constitution, no person may be deprived of liberty without due process of law,[64] but we have "declared Alaska's constitutional guarantee of individual liberty to be more protective" than its federal counterpart.[65]  But when a person has been found to be gravely disabled, as Naomi has been, the State's power of *parens patriae* authorizes it to commit her for involuntary treatment.[66]  Similarly, when a person has been found

---

[62]    *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375-76 (Alaska 2007) (first quoting *Humphrey v. Cady*, 405 U.S. 504, 509 (1972); then citing *Addington v. Texas*, 441 U.S. 418, 425 (1979)).

[63]    *See Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 248 (Alaska 2006) (quoting *Rivers v. Katz*, 495 N.E.2d 337, 341 (N.Y. 1986)).

[64]    U.S. Const. amend. XIV, § 1; Alaska Const. art. I, § 7.

[65]    *Myers*, 138 P.3d at 245 (citing *Breese v. Smith*, 501 P.2d 159, 170 (Alaska 1972)).

[66]    *E.P. v. Alaska Psychiatric Inst.*, 205 P.3d 1101, 1108 n.24 (citing *Rust v. State*, 582 P.2d 134, 139 n.16 (Alaska 1978)); *see also Myers*, 138 P.3d at 249 ("The doctrine of *parens patriae* refers to the inherent power and authority of the state to

(continued...)

likely to cause harm to others, as Linda has been, the State has a compelling interest in protecting the public, grounded in its police power.[67]

### 1. The superior court's finding that Naomi was gravely disabled is not clearly erroneous.

A court may issue an order committing an individual to a treatment facility for a 30-day period only if it "finds, by clear and convincing evidence, that the [individual] is mentally ill and as a result is likely to cause harm to [herself] or others or is gravely disabled."[68] Alaska Statute 47.30.915(9) defines "gravely disabled" as "a condition in which a person as a result of mental illness" either:

> (A) is in danger of physical harm arising from such complete neglect of basic needs for food, clothing, shelter, or personal safety as to render serious accident, illness, or death highly probable if care by another is not taken; or

> (B) will, if not treated, suffer or continue to suffer severe and abnormal mental, emotional, or physical distress, and this distress is associated with significant impairment of judgment, reason, or behavior causing a substantial

---

[66] (...continued) protect 'the person and property' of an individual who 'lack[s] legal age or capacity.' " (alteration in original) (first quoting *Pub. Defender Agency v. Superior Court, Third Judicial Dist.*, 534 P.2d 947, 949 (Alaska 1975); and then quoting *non sui juris*, BLACK'S LAW DICTIONARY (8th ed. 2004))).

[67] *See Wetherhorn*, 156 P.3d at 376 n.13 ("A person who presents a danger to others is committed under the state's police power. A person who requires care and treatment is committed through exercise of the state's *parens patriae* power. One who poses a danger to himself is committed under a combination of both powers." (quoting *Rust v. State*, 582 P.2d 134, 139 n.16 (Alaska 1978))); *see also Myers*, 138 P.3d at 248 (noting that "the state's power of civil commitment sufficed to meet its police-power interest" in protecting the public and the patient from the danger posed to herself or others).

[68] AS 47.30.735(c).

deterioration of the person's previous ability to function independently.

We have noted that "[i]t is not enough to show that care and treatment of an individual's mental illness would be preferred or beneficial or even in [that person's] best interests."[69]   Instead, for a court to properly commit an individual under AS 47.30.915(9)(B), there must be "a level of incapacity that prevents the person in question from being able to live safely outside of a controlled environment."[70]  The level of incapacity must be severe enough to "justify the social stigma that affects the social position and job prospects of persons who have been committed because of mental illness."[71]

Naomi argues that the evidence presented to the superior court was insufficient to support a finding that she was gravely disabled.  She asserts that the court's reliance on Dr. Mack's testimony was misplaced because his testimony about her housing situation was "speculative," and that other evidence of her risk of harm if released from API was "weak."  She further argues that her willingness to remain in the hospital suggested a level of amenability to treatment that brought her outside the statutory definition of "gravely disabled."  Naomi's arguments lack merit.

Dr. Mack's uncontroverted testimony was that Naomi did not have housing, that Naomi's disorder was severe enough that she could not be expected to find housing on her own, and that she may not have been able to eat and shower regularly unless API

---

[69]     *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 378 (Alaska 2007) (first alteration in original) (quoting *In re LaBelle*, 728 P.2d 138, 146 (Wash. 1986) (en banc)).

[70]     *In re Stephen O.*, 314 P.3d 1185, 1193 (Alaska 2013) (quoting *Wetherhorn*, 156 P.3d at 378).

[71]     *Wetherhorn*, 156 P.3d at 378.

provided her those amenities. Naomi acknowledged that she was unable to engage in discharge planning because "[s]he talked over the doctors or others trying to communicate with her" and "sometimes continued shouting even after returning to her own room." The superior court found that Naomi's delusions of rape and bodily harm and that her psychiatric status had become "more acute" during the time that she refused to take medication or to participate in planning her treatment.

Naomi points to nothing in the record contradicting Dr. Mack's testimony. Naomi's attorney asked no questions of Dr. Mack and presented no countervailing evidence to the court. Dr. Mack's testimony supports the court's finding that clear and convincing evidence showed Naomi to be gravely disabled. The court did not specify whether it found Naomi gravely disabled under subsection (A) or (B) of AS 47.30.915(9); we conclude that the court did not err in issuing the commitment order because uncontroverted evidence supports either or both findings. We affirm the court's finding as not clearly erroneous in this case but take this opportunity to remind the superior court of the importance — both for ensuring judicial transparency and for aiding appellate review — of specifying the precise statutory grounds on which it makes findings of grave disability.

2. **The superior court did not err in determining there was no feasible less restrictive alternative to hospitalizing Linda at API.**

After a court has found that a person is gravely disabled or poses a danger to herself or others, the court must consider whether that person should be involuntarily committed for treatment, or whether there is a less restrictive alternative available. Alaska Statutes 47.30.735(d) and AS 47.30.755(b) authorize commitment only if no feasible less restrictive alternative treatment is available.[72]

---

[72] *In re Jacob S.*, 384 P.3d 758, 768 (Alaska 2016) (requiring courts to
(continued...)

"We determine the boundaries of individual rights guaranteed under the Alaska Constitution by balancing the importance of the right at issue against the state's interests in imposing the disputed limitation."[73]  Involuntary commitment places a substantial burden on a fundamental right; accordingly the State must " 'articulate a compelling [state] interest' and . . . demonstrate 'the absence of a less restrictive means to advance [that] interest.' "[74]  To that end, we have concluded that "[f]inding that no less restrictive alternative exists is a constitutional prerequisite to involuntary hospitalization."[75]

> ### a.  A less restrictive alternative to involuntary commitment is not "feasible" or legally relevant if it does not exist.

Linda argues on appeal that the superior court erred by rejecting Soteria-Alaska as a less restrictive alternative, and that it was therefore a violation of Linda's constitutional right to liberty to order her committed to API.  The State posits that there was no error, citing our statement in *Bigley v. Alaska Psychiatric Institute* that for a program to be considered a less restrictive alternative, "the alternative must actually be available, meaning that it is feasible and would actually satisfy the compelling state

---

[72]  (...continued)
"consider whether a less restrictive alternative would provide adequate treatment" when involuntary commitment is sought); *Mark V. II*, 375 P.3d 51, 58-59 (Alaska 2016) (requiring a petitioner seeking involuntary commitment to prove by clear and convincing evidence that there are no less restrictive alternatives).

[73]  *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 245 (Alaska 2006).

[74]  *Id.* at 245-46 (alterations in original) (first quoting *Ranney v. Whitewater Eng'g*, 122 P.3d 214, 222 (Alaska 2005); then quoting *Sampson v. State*, 31 P.3d 88, 91 (Alaska 2001)).

[75]  *Mark V. II*, 375 P.3d at 59.

interests that justify the proposed state action."[76]   Accordingly, the State argues that "[b]ecause Soteria-Alaska is closed, it is neither 'available' nor 'feasible' as an option for Linda." Linda argues in response that the State reads *Bigley*'s feasibility requirement too narrowly and that "Soteria-Alaska was not infeasible just because it had been closed." Quoting language from our decision in *State v. Alaska Laser Wash, Inc.*, Linda asserts that "feasible" means "[c]apable of being accomplished or brought about; possible."[77]   Using that definition, Linda concludes that "Soteria-Alaska was clearly feasible because it had operated quite well for seven years."

Linda's argument is not persuasive, as it fails to consider *for whom* an alternative is feasible.  In essence, Linda's argument is that because it would be possible for the State to establish and operate a mental health facility and program similar to Soteria-Alaska, which was a private facility, the superior court was required to consider Soteria-Alaska a "feasible" less restrictive alternative to hospitalization.  But whether or not it might be feasible, possible, or even advisable for the State to establish a facility and operate such a program,[78] with or without additional funding from the legislature, committing Linda to Soteria-Alaska or another Soteria-like setting was not an option for

---

[76]     208 P.3d 168, 185 (Alaska 2009).

[77]     382 P.3d 1143, 1152 (Alaska 2016) (alteration in original) (quoting *Feasible*, AMERICAN HERITAGE DICTIONARY (5th ed. 2014)).  *Alaska Laser Wash* arose from an inverse condemnation claim by a car wash owner; in that case, we decided that the "feasibility, rather than reasonableness," of relocating a business "is the correct standard for analyzing whether a business owner may recover business-loss damages when the State condemns the business owner's property." *Id.*  The case did not involve the question whether a less restrictive alternative existed to infringing on a persons constitutional rights.  Thus, beyond providing a dictionary definition of the word "feasible," our decision in *Alaska Laser Wash* is not relevant to the discussion here.

[78]     We draw no conclusions and express no opinion on whether this is the case.

the superior court. The court was faced with the question what to do about Linda, whom the jury had found to be mentally ill and a danger to others; the court needed to answer that question with one of the options actually available to it at the time of the hearing. Because Soteria-Alaska was closed, it was not "actually . . . available,"[79] and sending Linda there was not feasible. The State had no duty to re-open the private facility or to establish and operate a similar facility to meet its burden in this case.

### b. The superior court did not clearly err in finding that no less restrictive alternative existed.

Whether or not Linda's proposed alternative — Soteria-Alaska — was feasible, the State had the burden to show by clear and convincing evidence that no less restrictive alternative to commitment existed.[80] To that end, the parties explored several possible alternatives, including outpatient community support and assisted living facilities. The superior court found that a viable alternative would need to "protect the public from the harm of delusions where [Linda] might believe she's being chased by others and cause traffic accidents" or might "react[] in a physical manner." It also found that when Linda becomes agitated, it happens rapidly, which "could cause others to react to her [and cause] her to take actions that pose risks to the public." The court concluded

---

[79] *Bigley*, 208 P.3d at 185. The issue raised in *Bigley* — whether a less intrusive alternative to psychotropic medication was available — is not identical to the issue Linda raises here: whether a less restrictive treatment than commitment is available. *See id.* at 185-86. But because both inquiries balance "the fundamental liberty and privacy interests of the patient against the compelling state interest[s]" of protecting disabled individuals and the public, and because both require a finding that no less intrusive or less restrictive alternative exists, the court must perform substantially the same feasibility analysis in each case. *Id.* at 185; *see Mark V. II*, 375 P.3d at 59.

[80] *Mark V. II*, 375 P.3d at 58. Evidence is clear and convincing if it "produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved." *Bigley*, 208 P.3d at 187 (quoting *Buster v. Gale*, 866 P.2d 837, 844 (Alaska 1994)).

that none of the proposed less restrictive alternatives would protect the public "from the danger to others that [Linda] currently [poses]," and that Linda needed "a facility like API that is locked and . . . provides 24/7 care."[81]

In short, we find no clear error in the superior court's finding that no feasible less restrictive alternative to involuntarily committing Linda to API existed. We therefore affirm the superior court's commitment order in her case.

## C.    The Superior Court Did Not Err In Granting API's Involuntary Medication Petition For Naomi.

After a court has ordered an individual involuntarily committed, the State may forcibly administer psychotropic medication in a non-crisis situation only if the individual "is determined by a court to lack the capacity to give [or withhold] informed consent" to the medication, and the State demonstrates "by clear and convincing evidence that the involuntary administration of psychotropic medication is in the best interests of the patient and that no less intrusive alternative treatment is available."[82] Naomi asks us to vacate the involuntary medication order in her case, arguing that the superior court erred in finding that administration of medication was in her best interests and in finding that there was no less intrusive alternative. Both claims rely on already-rejected interpretations of applicable law.

---

**81**    Linda has not challenged the court's finding that the State's interest in protecting the public required placing her in a locked facility with 24/7 care.

**82**    *Bigley*, 208 P.3d at 179-80 (first citing AS 47.30.836; then citing *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 249-50 (Alaska 2006)).

### 1. The superior court did not err in its consideration of the best interests factors.

In *Myers v. Alaska Psychiatric Institute* we drew upon the statutory framework for informed consent to the administration of psychotropic medication to articulate factors that a court must consider in making a best interests determination for the involuntary administration of psychotropic drugs:[83]

> (A) an explanation of the patient's diagnosis and prognosis, or their predominant symptoms, with and without the medication;
>
> (B) information about the proposed medication, its purpose, the method of its administration, the recommended ranges of dosages, possible side effects and benefits, ways to treat side effects, and risks of other conditions, such as tardive dyskinesia;
>
> (C) a review of the patient's history, including medication history and previous side effects from medication;
>
> (D) an explanation of interactions with other drugs, including over-the-counter drugs, street drugs, and alcohol; and
>
> (E) information about alternative treatments and their risks, side effects, and benefits, including the risks of nontreatment.[84]

---

[83] 138 P.3d at 252 (directing courts to apply AS 47.30.837(d)(2)'s informed consent factors to the best interests determination).

[84] *Id.* (quoting AS 47.30.837(d)(2)).

We stated that these factors are "crucial in establishing the patient's best interests,"[85] and we further explained in *Bigley* that "their consideration by the trial court is mandatory."[86] We call these the "*Myers* factors."[87]

But *Myers* also discussed a second set of best interests principles derived from a Minnesota Supreme Court decision:

> (1) the extent and duration of changes in behavior patterns and mental activity effected by the treatment;
>
> (2) the risks of adverse side effects;
>
> (3) the experimental nature of the treatment;
>
> (4) its acceptance by the medical community of the state; and
>
> (5) the extent of intrusion into the patient's body and the pain connected with the treatment.[88]

We refer to them as the "Minnesota factors"[89] and explained in *Bigley* that "to the extent they differ from the *Myers* factors, their consideration by Alaskan courts is favored but not mandatory."[90]

Naomi concedes that the superior court assessed the petition for involuntary administration of medication according to the mandatory *Myers* factors. She argues that the court nonetheless erred because *In re Gabriel C.* requires the court to apply the

---

[85]   *Id.*; *accord Bigley*, 208 P.3d at 180.

[86]   208 P.3d at 180.

[87]   *Id.*

[88]   138 P.3d at 252 (citing *Price v. Sheppard*, 239 N.W.2d 905, 913 (Minn. 1976)).

[89]   *Bigley*, 208 P.3d at 180.

[90]   *Id.* at 180-81.

Minnesota factors to its analysis.[91]  While our opinion in that case does refer to the Minnesota factors in its discussion of *Myers*,[92] it misquoted *Myers* as making the Minnesota factors mandatory and does not alter the analytical framework established by *Myers* and *Bigley*.  We reiterate that the Minnesota factors offer " 'helpful' and 'sensible' " guidance in determining whether involuntary medication is in a patient's best interests, but they are not a mandatory component of the analysis.[93]  The superior court, therefore, did not err by not considering the Minnesota factors in its best interests determination.

### 2. The superior court did not err in determining that there was no less intrusive alternative to medication.

In order to administer psychotropic medication without a patient's consent, the State must also show by clear and convincing evidence "that no less intrusive alternative treatment is available."[94]  Determining whether a less intrusive alternative exists involves both "a balancing of legal rights and interests" and a factual inquiry into alternative treatments.[95]  The legal balancing weighs "the fundamental liberty and privacy interests of the patient against the compelling state interest under its *parens patriae* authority to 'protect "the person and property" of an individual who lack[s] legal

---

[91]  324 P.3d 835, 840 (Alaska 2014).

[92]  *Id.*

[93]  *Bigley*, 208 P.3d at 180-81 (quoting *Myers*, 138 P.3d at 252).  We disavow any erroneous statements to the contrary.  *Cf. In re Jacob S.*, 384 P.3d 758, 772 (Alaska 2016); *Gabriel C.*, 324 P.3d at 840.

[94]  *Bigley*, 208 P.3d at 180.

[95]  *Id.* at 185.

age or capacity.' "[96] This is interwined with the factual assessment of "the feasibility and likely effectiveness of a proposed alternative."[97] A proposed alternative "must actually be available, meaning that it is feasible and would actually satisfy the compelling state interests that justify the proposed state action."[98]

Naomi argues that our opinion in *Bigley* obligates the superior court to "weigh the liberty interests of the patient and the feasibility of alternative treatments expressly in its findings" and that it was error not to do so. She cites *Bigley*'s direction that courts "must balance the fundamental liberty and privacy interests of the patient against the compelling state interest."[99] The State argues that *Bigley*'s directive does not require the trial court to weigh these factors expressly, but rather reiterates the overarching principle articulated in *Myers* that "[w]hen no emergency exists . . . the state may override a mental patient's right to refuse psychotropic medication only when necessary to advance a compelling state interest and only if no less intrusive alternative exists."[100] We agree with the State in observing that in *Bigley* we did not ask trial courts to expressly weigh the patient's liberty and privacy interests against the State interest in administering the medication. Rather, the balancing of these two interests is encompassed in the less intrusive alternative inquiry, which requires courts to consider both the availability of alternatives to medication and the feasibility of those

---

[96]     *Id.* (alteration in original) (quoting *Myers*, 138 P.3d at 249).

[97]     *Id.*

[98]     *Id.*

[99]     *Id.*

[100]    *Myers*, 138 P.3d at 248.

alternatives.[101]  The superior court therefore did not err in not explicitly weighing Naomi's liberty and privacy interests against the State's interest in administering medication.[102]

Naomi also argues that the evidence considered by the superior court was insufficient to establish that there was no less intrusive alternative to medication.  In determining that there existed no less intrusive alternative to forced medication, the court found that "[w]ithout the administration of the medication at issue there would be no improvement but only further decompensation as to [Naomi's] mental functioning."  The court heard testimony that Naomi's mental health had worsened during the period in which she refused to take medication.  And it credited Dr. Mack's testimony that the medication was needed because Naomi could not benefit from less intrusive alternatives without it:  "[A]ll present paradigm psychiatric literature," Dr. Mack testified, "reflects [that medications] are the absolute cornerstone and foundation to success."  Naomi correctly observes that "[w]hile the doctor's perspective [on this issue] is relevant, it is not dispositive," but Naomi neither challenged Dr. Mack's perspective at the evidentiary hearing nor proposed any alternatives to medication — feasible or otherwise.  The superior court was entitled to rely on Dr. Mack's analysis in reaching its conclusion, and it was not clearly erroneous to find that there was no less intrusive alternative to medication.

---

[101]  *Bigley*, 208 P.3d at 185.

[102]  *Cf. Kiva O. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 408 P.3d 1181, 1190 (Alaska 2018) (holding that "*Myers* requires only that the court consider the relevant factors; it does not dictate the weight the court gives them").

## V.    CONCLUSION

We hold that all appeals from orders for involuntary admission for treatment and involuntary medication categorically fall under the public interest exception to the mootness doctrine. We therefore consider the merits of Linda's and Naomi's appeals. We AFFIRM the superior court's commitment order in Linda's case because the superior court did not clearly err in finding that no feasible less restrictive alternatives to commitment existed. We also AFFIRM the commitment order in Naomi's case because the superior court did not clearly err in finding that Naomi was gravely disabled. And because we discern no error in the superior court's issuance of the medication order in Naomi's case, we AFFIRM the involuntary medication order.

BOLGER, Justice, concurring.

I agree with the court's ultimate conclusion that the mootness doctrine does not apply to these cases. But I would reach this conclusion on different grounds. The court's reliance on the public interest exception to the mootness doctrine is misplaced. The court concludes that every commitment case involves important issues that are capable of repetition because "an opinion considering whether a commitment order in one case was supported by sufficient evidence will likely be useful as guidance by analogy to future commitment proceedings."[1] But as we have recognized, this reasoning could justify review of "every moot case in general."[2] I am concerned that our review of such routine controversies on public interest grounds will undermine the basis for the public interest exception.

We decline to address moot controversies because "the very nature of our judicial system renders it incapable of resolving abstract questions or of issuing advisory opinions which can be of any genuine value."[3] If the controversy is moot, the litigants have less incentive to make their best arguments.[4] And regardless of the arguments' quality, we will "lay down rules that may be of vital interest to persons" who will face future proceedings — this is "a harsh rule" for future litigants, who will be bound by

---

[1]     *Supra* page 19.

[2]     *In re Gabriel C.*, 324 P.3d 835, 840 (Alaska 2014).

[3]     *Moore v. State*, 553 P.2d 8, 23 n.25 (Alaska 1976), *superseded on other grounds by statute*.

[4]     *State v. Keep*, 409 P.2d 321, 325 (Alaska 1965) (citing *United States v. Evans*, 213 U.S. 297, 300 (1909)).

decisions where opposing views were not vigorously presented because the controversy was moot.[5]

The collateral consequences doctrine, in contrast, "allows courts to decide otherwise-moot cases when a judgment may carry indirect consequences in addition to its direct force."[6] Several years ago we recognized that the collateral consequences from a person's first involuntary commitment order were sufficient to require review of an otherwise-moot appeal.[7] But we later decided that the collateral consequences exception did not apply to a respondent who had previous commitment orders because we were "unconvinced that the mere possibility of additional but unparticularized collateral consequences automatically justifies substantive review of every subsequent involuntary commitment order entered against a respondent."[8]

I disagree with the latter proposition. There is no evidence that a previous commitment order inoculates the respondent from the general consequences of a subsequent commitment; I would not require any additional showing to allow review. We do not require such a showing in the criminal law; instead we decide criminal cases even after defendants complete their sentences because we assume that a criminal judgment always carries collateral consequences.[9] Many other state courts similarly

---

[5]    *Id.* (quoting *Evans*, 213 U.S. at 300).

[6]    *In re Joan K.*, 273 P.3d 594, 597-98 (Alaska 2012) (quoting *Peter A. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 146 P.3d 991, 994-95 (Alaska 2006)).

[7]    *Id.* at 598.

[8]    *In re Mark V.*, 324 P.3d 840, 845 (Alaska 2014).

[9]    *See State v. Carlin*, 249 P.3d 752, 764 (Alaska 2011) (holding that a deceased defendant's appeal was not moot).

allow review of expired involuntary commitment orders.[10]  I would review these orders because they have continuing collateral consequences.

---

        **10**       *See In re Walter R.*, 850 A.2d 346, 350 (Me. 2004) (holding that collateral consequences of an involuntary commitment order precluded application of the mootness doctrine); *State v. K.J.B.*, 416 P.3d 291, 298 (Or. 2018) (denying motion to dismiss appeal because state had not shown the absence of collateral consequences); *State v. K.E.W.*, 315 S.W.3d 16, 20 (Tex. 2010) (holding that the mootness doctrine did not apply to an expired involuntary commitment order); *State v. J.S.*, 817 A.2d 53, 56 (Vt. 2002) (recognizing the continuing effects of negative collateral consequences, including legal disabilities and social stigma, from being adjudicated mentally ill and then involuntarily hospitalized); *In re Det. of H.N.*, 355 P.3d 294, 298 (Wash. App. 2015) (permitting review of expired involuntary commitment order due to likely collateral consequences).