NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Necessity for the Hospitalization of ) <br><br> ANNIKA G. ) | Supreme Court No. S-16588 <br><br> Superior Court No. 3AN-16-02734 PR <br><br> <u>MEMORANDUM OPINION<br>AND JUDGMENT</u>* <br><br> No. 1763 – April 29, 2020 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Eric A. Aarseth, Judge.

Appearances: Rachel E. Cella, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Annika G. David T. Jones, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for State of Alaska.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

## I.   INTRODUCTION

A respondent appeals the superior court's 90-day involuntary commitment order, arguing that the court erred by finding she was gravely disabled and there was no less restrictive alternative than commitment. Seeing no error, we affirm the superior court's order.

---

\*      Entered under Alaska Appellate Rule 214.

## II. FACTS AND PROCEEDINGS

### A. Facts Leading To 30-Day Involuntary Commitment

Annika G.[1] is diagnosed with schizoaffective disorder, causing her to experience complex delusions and hallucinations.[2] Annika receives mental health treatment and psychotropic medications through the Veteran's Administration (VA). She also receives assistance from a care provider.

At the end of 2015 Annika began visiting a new VA psychiatrist; she then stopped taking one of her prescribed medications and reduced the dosage of another medication. Annika's condition deteriorated, and in March 2016 she was hospitalized for 72 hours before being released.

In early November Annika's care provider filed a petition for a court order authorizing Annika's hospitalization for evaluation.[3] The care provider recounted that she had found Annika "wandering the streets with her dog." While the care provider was driving Annika to new housing, Annika allegedly began "threatening, screaming, yelling," was "very delusional," and eventually "threw her dog" at the care provider. The care provider stated that she was fearful of what Annika would do, explaining that historically "when [Annika] quits taking her meds, she escalates to the point of needing hospitalization . . . to get back to her baseline." The care provider recounted Annika's

---

[1] We use a pseudonym to protect Annika's privacy.

[2] "In schizoaffective disorder, a mood episode and the active-phase symptoms of schizophrenia occur together and were preceded or are followed by at least 2 weeks of delusions or hallucinations without prominent mood symptoms." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 89 (5th ed. 2013).

[3] *See* AS 47.30.700(a) (providing that "any adult" may file petition seeking another individual's involuntary hospitalization for evaluation and establishing initial involuntary commitment procedures).

refusal to move out of her apartment, repeatedly threatening harm to her landlord, and irrational belief that "she own[ed] the apartment complex." The care provider believed she no longer could care for Annika without "a higher level of intervention."

A magistrate judge ordered a screening investigation.[4] Based on the care provider's petition and the screening investigation report, the magistrate judge found probable cause existed that Annika was mentally ill and likely to cause serious harm to herself and others, noting that Annika was "approaching a state of grave disability." The superior court adopted the magistrate judge's recommendation and ordered Annika's hospitalization for evaluation.[5] Annika was taken to Alaska Psychiatric Institute (API) for evaluation.

The next day Annika's two examining mental health professionals filed a petition for Annika's 30-day involuntary commitment.[6] The mental health professionals believed Annika was mentally ill and as a result was (1) likely to cause harm to herself or others, and (2) gravely disabled. They explained that Annika was preoccupied with delusional beliefs of "circles, symbols, and maggot infected babies." They stated that

---

[4]     *See id.*(requiring post-petition screening investigation); *see also In re Hospitalization of Paige M.*, 433 P.3d 1182, 1188 (Alaska 2018) (describing AS 47.30.700 requirement for court or mental health professional to conduct screening investigation to evaluate petition allegations before initial involuntary hospitalization of respondent).

[5]     *See* AS 47.30.700(a) (establishing procedures for court to issue ex parte order to deliver respondent to nearest appropriate evaluation facility for emergency examination or treatment upon finding that "there is probable cause to believe the respondent is mentally ill and that condition causes the respondent to be gravely disabled or to present a likelihood of serious harm to self or others"); *see also* AS 47.30.715 (limiting time period respondent can be held for emergency evaluation to 72 hours).

[6]     *See* AS 47.30.730 (establishing 30-day involuntary commitment petition requirements when respondent is under 72-hour evaluation at treatment facility).

Annika had refused medication, threatened community members, "threw her dog in anger," was homeless, and was "thinking of suicide." Annika's API treating psychiatrist requested an order for involuntary administration of psychotropic medication, noting that Annika had been refusing medications.[7]

## B.     30-Day Involuntary Commitment Hearing

The superior court held an involuntary commitment hearing a few days later.[8] Annika waived her presence at the hearing.[9] The court received testimony from Annika's care provider; the manager of the apartment complex where Annika formerly lived; and Annika's API psychiatrist. The care provider testified that Annika was frequently hungry because she spent nearly all her money on dog food, cigarettes, and junk food. The care provider also said Annika's apartment had dog urine and feces on the floor. Recounting Annika's recent aggression, the care provider stated she was unwilling to be alone with Annika for fear of being physically attacked. The care

---

[7]     *See* AS 47.30.839 (establishing procedures for obtaining court order for involuntary administration of psychotropic medication in crisis situations, or in non-crisis situations when there is reason to believe patient is incapable of providing informed consent); *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 254 (Alaska 2006) (requiring  court to find, in addition to statutory requirements, that "the proposed treatment is in the patient's best interests and that no less intrusive alternative is available" before ordering involuntary administration of medication to patient).

[8]     Although Annika focuses on the testimony from the 90-day commitment hearing, the superior court's findings from the 30-day commitment order influenced its 90-day order to extend Annika's commitment. Accordingly, we briefly summarize here the testimony from the 30-day commitment hearing. *See* Alaska R. App. P. 210(a) (providing that record on appeal "consists of the entire trial court file, including the original papers and exhibits filed in the trial court, the electronic record of proceedings before the trial court, and transcripts, if any, of the trial court proceedings").

[9]     *See* AS 47.30.735(b)(1) (providing respondent's right to be present or waive presence at 30-day commitment hearing).

provider explained that Annika believed she could call snipers to kill people, kept chairs in her apartment for beings called "inhumans," and believed the care provider was multiple people.

The apartment manager testified about Annika's beliefs that she owned the apartment building, worked for the federal government, and could call snipers to kill the manager and apartment staff for evicting her. The manager testified that she and other staff took Annika's threats seriously and that residents were afraid of Annika. The manager said that Annika continued trespassing on the property after being evicted, claiming there were "crying babies in her apartment," and requiring police intervention to remove her.

Annika's API treating psychiatrist testified that when Annika arrived for emergency evaluation, she appeared to have been "sleeping poorly" and was "in an agitated emotional state . . . consistent with mania or hypomania." He noted that Annika's agitation had improved without treatment but that her delusions continued. He testified that Annika had a "very complex" and consistent delusional system and that he believed she was gravely disabled because she had "substantially deteriorated" since ceasing to take her prescribed medications. He believed Annika could harm herself or others, although he acknowledged that she had not harmed anyone since her hospitalization. He said that Annika refused to follow her VA psychiatrist's recommendations.

The magistrate judge made oral findings and a recommendation for Annika's 30-day commitment, which the superior court later adopted. The court's written findings noted that Annika could not take care of herself, her personal hygiene, or her dog and that her apartment was "dirty," with "dog urine and feces on the floor." The court found that Annika had "become delusional and aggressive toward others, including throwing her pet yorkie at [her care provider] while [the care provider] was

driving" and that Annika was making threats to kill apartment staff, requiring police intervention. The court found that the care provider would "no longer be alone with [Annika]" and that Annika continued to trespass at the apartment complex where she had lived, believing "she own[ed] the building and [could not] be evicted." The court cited the psychiatrist's testimony that Annika had "complex delusions about snipers, dead babies, maggots eating baby brains, symbols, [and] working for the FBI." The court found that Annika's symptoms substantially deteriorated when she stopped taking her prescribed medications. Although API petitioned for Annika's involuntary commitment on the grounds that she was both (1) likely to cause harm to herself and others, and (2) gravely disabled, the court did not find Annika was gravely disabled. It granted the 30-day commitment petition based on the ground that Annika was likely to cause harm to herself or others. The court also approved API's petition to administer psychotropic medications to Annika.

## C. 90-Day Commitment Petition And Hearing

Shortly before the end of the 30-day commitment period, Annika's API psychiatrist filed a petition for a continued 90-day commitment.[10] He identified Annika as "gravely disabled as previously alleged in the Petition for 30-Day Commitment," describing her continued delusions about "maggot infested babies and symbols of circles." The psychiatrist noted that Annika had demonstrated "improved peer and staff relationships" and "improved self care in the hospital" but that "she becomes enraged and refuses to participate in discharge planning, stating her apartment is a 'paint trap,'

---

[10] Alaska Statute 47.30.740 establishes procedures for 90-day commitment of a person and provides that during the 30-day commitment, a person in charge of the committed person may petition for a hearing requesting a further 90-day commitment. Factual findings made at a 30-day commitment hearing about a respondent's behavior may be admitted as evidence in the 90-day commitment hearing. *Id.*

and she can find a place to live with her 'millions of dollars.' " The psychiatrist did not believe Annika could survive winter without a "secure place to live."

The magistrate judge held a hearing on the 90-day commitment petition.[11] The psychiatrist testified that Annika had become "somewhat more organized in her thoughts and her behaviors" since her 30-day commitment. He noted that Annika was cooperative and friendly, with significant improvement in social interactions. He specifically noted that Annika was "helpful to other clients" with "deep compassion for their needs." He testified that Annika was eating and sleeping appropriately.

The psychiatrist testified that the "significant barrier" to Annika's discharge was her "ongoing delusions." He said that Annika continued believing she was a presidential attaché working for the FBI, being preoccupied with "paint traps" and circles, and believing she had to protect baby brains from being implanted with maggots. He further testified that Annika had exhibited behavior consistent with hallucinations by walking up and down the hallway talking to herself and occasionally crying out that someone was "putting something into her brain." He believed Annika's "hallucinative type" experiences had remained the same throughout her 30-day commitment.

The psychiatrist believed Annika had no intention of living in a shelter upon release, despite her history of living in shelters. He viewed her as a "vulnerable person" who could not live safely in a shelter or on the street during winter. He explained that "[w]hen she believes that another person is doing something that could in any way harm one of these babies that she imagines are being endangered, she becomes very threatening and agitated." He admitted only "[m]odest concerns" that

---

[11]    *See* AS 47.30.750 (providing that 90-day involuntary commitment hearing "shall be conducted in the same manner, and with the same rights for the respondent," as for 30-day commitment hearing); AS 47.30.735(b) (setting out respondent's rights concerning 30-day commitment hearing).

Annika would harm others based on her past behavior. He noted Annika's unwillingness to make reasonable housing plans, citing her beliefs that she had "millions of dollars" and that the FBI, the president, and a Yale-trained lawyer would take care of her needs and find her housing. But he acknowledged that Annika had agreed to work with her VA psychiatrist and to resume taking her previously prescribed medications.

Annika also testified at the hearing, acknowledging her mental health challenges, including a "[s]mall" psychosis. She denied any desire to harm herself or others. She said she intended to resume taking the medications her VA psychiatrist prescribed, and she planned to reside at a shelter, where she could take care of her basic needs while continuing to visit the VA. She believed she would not encounter anyone who could provoke her anger because she limited her excursions to the grocery store and the VA, where she claimed she got along with everyone. Annika maintained her refusal to reside at the apartment her care provider had secured. She explained that her friends could not easily drive to the apartment in the winter and that she "ate paint there with blinding symbols that were loyal to [her] and not to the president of this state, who keeps interfering."

During closing arguments Annika interrupted several times. Annika's interruptions focused on discontent with her care provider and a belief that her care provider was "five or six different women." Annika expressed unwillingness to work with her care provider and intent to press criminal charges against the care provider for breaking into Annika's apartment, kidnaping her, and trying to force her into a "trap of a house" that would "blind" her and leave her "disabled."

D.    Superior Court's Findings And 90-Day Commitment Order

At the hearing's conclusion the magistrate judge made oral and written findings, which the superior court later adopted. After orally finding that API was an appropriate facility for Annika and had provided her adequate care, the court turned to

the "more troubling" issue of a gravely disabled finding. The court found that Annika could now meet her basic needs and generally engage in rational discussions. The court found that, despite Annika's improvements, she continued to experience "complex delusions to include babies' brains being infected with maggots and that she is a presidential or FBI attach[é] who is responsible to protect the babies." The court noted Annika's unwillingness to live at her available apartment because of her belief it "trap[ped] paint," and her care provider's concern about Annika's "aggressive delusional condition." The court agreed with the API psychiatrist's opinion that living in a shelter was not a viable option for Annika, observing that she "clearly does get quite animated and agitated" when she experiences her delusions. The court also considered Annika's history of rapid decompensation after ceasing to take her medications. The court concluded that Annika "continue[d] to be gravely disabled under AS 47.30.915(9)(B)," requiring a further 90-day commitment.[12]

Annika appeals the 90-day commitment order.

## III.   STANDARD OF REVIEW

We review factual findings in an involuntary commitment proceeding for clear error, reversing "only if we have a 'definite and firm conviction that a mistake has

---

[12]   *See* AS 47.30.755(a) (providing that after 90-day commitment hearing, "the court may commit the respondent to a treatment facility for no more than 90 days" if it finds by "clear and convincing evidence that the respondent is mentally ill and as a result is likely to cause harm to self or others, or is gravely disabled").

been made.' "[13]  But we decide de novo whether involuntary commitment findings meet statutory requirements.[14]

## IV.  DISCUSSION

### A.  The Superior Court Did Not Err By Finding Annika Gravely Disabled.

Annika argues that the superior court misapplied the gravely disabled standard by requiring her to "return to precisely the same level of functioning as before" her hospitalization.  She argues that the court improperly found her homelessness rendered her gravely disabled.  Annika also contends that the State failed to present clear and convincing evidence she remained gravely disabled by the time of the 90-day commitment hearing.

Before involuntarily committing a person, the superior court must find by clear and convincing evidence that the person is "mentally ill and as a result is likely to cause harm to [herself] or others or is gravely disabled."[15]  The court found that Annika was gravely disabled under AS 47.30.915(9)(B), requiring evidence that the respondent suffers from mental illness and:

> will, if not treated, suffer or continue to suffer severe and
> abnormal mental, emotional, or physical distress, and this
> distress is associated with significant impairment of
> judgment, reason, or behavior causing a substantial

---

[13]     *In re Hospitalization of Linda M.*, 440 P.3d 168, 171 (Alaska 2019) (quoting *In re Hospitalization of Jacob S.*, 384 P.3d 758, 763-64 (Alaska 2016)).

[14]     *Id.* (quoting *In re Jacob S.*, 384 P.3d at 764).

[15]     AS 47.30.735(c); *see also* AS 47.30.755(a) (applying same standard for 30-day involuntary commitment to 90-day commitment order).  Clear and convincing evidence demands "a firm belief or conviction about the existence of a fact to be proved."  *In re Hospitalization of Stephen O.*, 314 P.3d 1185, 1192-93 (Alaska 2013) (quoting *In re Johnstone*, 2 P.3d 1226, 1234 (Alaska 2000)).

deterioration of the person's previous ability to function independently.

The " 'distress' that justifies commitment [under subsection (B)] refers to a level of incapacity that prevents the person in question from being able to live safely outside of a controlled environment."[16]

Annika correctly notes that the court compared her pre-hospitalization ability to function independently with her ability to function at the time of the 90-day commitment hearing. The court orally found that the State had shown that Annika was "not quite ready to live independently again as she did previously" and that her present delusional experiences "would make it very difficult for her to maintain in the same way that she did out in the community." But subsection (B) authorizes the court to compare Annika's present condition with her condition prior to hospitalization. Annika's condition prior to hospitalization could serve as a baseline for determining whether her ability to function independently had been restored during her 30-day commitment or whether she still was at risk for "substantial deterioration" in her ability to function independently if she were released too soon.[17]

Moreover, the court's analysis did not focus only on Annika's present functioning compared to her pre-hospitalization functioning. Consistent with the

---

[16] *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 378 (Alaska 2007), *overruled in part on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918, 924-31 (Alaska 2019) (quoting AS 47.30.915(7)(B)). In 2014 AS 47.30.915 was reorganized and renumbered. AS 47.30.915, Revisor's notes, at 1132 (2018). The definition of "gravely disabled" was renumbered from (7) to (9). *See id.*

[17] *In re Hospitalization of Mark V.*, 375 P.3d 51, 57 (Alaska 2016) ("The definition [of subsection (B)] establishes 'the person's previous ability to function independently' as the baseline from which 'a substantial deterioration' is measured." (quoting AS 47.30.915(9)(B))), *overruled in part on other grounds by In re Naomi B.*, 435 P.3d at 924-31.

commitment statute,[18] the court focused on whether Annika's judgment and behavior were so significantly impaired that she could not function independently.[19] The court considered Annika's homelessness in making this determination. The court's consideration of Annika's homelessness, however, did not inappropriately focus on her living standard.[20] Compared to a single-occupancy apartment, a homeless shelter can increase the likelihood of contact with others. Annika's API psychiatrist believed that Annika "would have difficulty" complying with rules at a shelter and that she could become agitated and threatening to others while at the shelter if she suffered from a delusion about a person harming a baby. The court instead analyzed how Annika's present delusions stoked her agitation and aggression toward other people. The court previously found in its 30-day commitment order that Annika had repeatedly threatened to kill apartment staff and had thrown her dog at her care provider.[21] In the 90-day commitment order the court noted that, although Annika's condition had improved, she "becomes quite agitated and aggressive when she experiences her ongoing delusions

---

[18]    AS 47.30.915(9) (defining "gravely disabled"); *see also* AS 47.30.750 (providing that hearing for 90-day commitment "shall be conducted in the same manner, and with the same rights for the respondent," as for 30-day commitment hearing in AS 47.30.735(b)).

[19]    *See* AS 47.30.915(9)(B) (including in definition of "gravely disabled" mental distress "causing a substantial deterioration of the person's previous ability to function independently").

[20]    *See O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975) ("[W]hile the State may arguably confine a person to save him from harm, incarceration is rarely if ever a necessary condition for raising the living standards of those capable of surviving safely in freedom, on their own or with the help of family or friends.").

[21]    *See* AS 47.30.740(c) (providing that "[f]indings of fact relating to the respondent's behavior made at a 30-day commitment hearing . . . shall be admitted as evidence" for 90-day commitment hearing).

about babies," and that her care provider continued to be "unwilling to be alone with [Annika]." In applying the forward-looking aspect of subsection (B), the court also found that Annika previously had "deteriorated rapidly" when living independently, implying that Annika's release would lead to a relapse.[22] Based on the court's findings from the previous 30-day commitment hearing and the evidence presented at the 90-day commitment hearing, the court properly found by clear and convincing evidence that Annika was gravely disabled.[23]

## B.    The Superior Court Did Not Err When It Found No Less Restrictive Alternatives.

Annika argues that the superior court failed to balance her liberty interests with the State's interest in treating her. She contends that once she proposed an

---

[22]    *See In re Hospitalization of Jeffrey E.*, 281 P.3d 84, 88 (Alaska 2012) (noting that "the statutory definition of gravely disabled is forward-looking — even if [the respondent] were not suffering from distress at the exact time of the hearing, he still could be gravely disabled at that time if he would suffer distress in the near future as a result of his mental illness").

[23]    The statutory involuntary commitment framework considers a 90-day commitment to be an extension of the initial 30-day commitment. *See* AS 47.30.740, AS 47.30.745. The court may continue an involuntary commitment for 90 days under AS 47.30.740(a)(1) if, among other grounds, "the respondent *continues* to be gravely disabled" (emphasis added). API alleged in its 30-day commitment petition that Annika was (1) likely to cause harm to herself or others and (2) gravely disabled. Although the parties presented ample evidence at the 30-day commitment hearing to support a gravely disabled finding, the superior court found in the 30-day commitment order only that Annika was likely to cause harm to herself or others. At the 90-day commitment hearing the court ordered extending commitment for 90 days on the ground that Annika "continues to be gravely disabled" under AS 47.30.915(9)(B). But the court never initially made a finding that Annika was gravely disabled. The court's basis for Annika's continued commitment appears unaligned with the statutory procedure for 90-day commitment orders because of the lack of a gravely disabled finding in the 30-day commitment order. We do not decide this issue because Annika did not raise it to the superior court or on appeal.

outpatient treatment plan, the State should have inquired into the plan's feasibility by reaching out to her VA psychiatrist. Annika argues that the superior court dismissed her outpatient treatment plan after hearing the API psychiatrist's testimony without independently assessing less restrictive alternatives.

Before a court can order an individual's involuntary commitment, the State must prove by clear and convincing evidence that there are no less restrictive alternatives.[24] The "least restrictive alternative" is the one that is "no more harsh, hazardous, or intrusive than necessary to achieve the treatment objectives of the patient" and "involve[s] no restrictions on physical movement nor supervised residence or inpatient care except as reasonably necessary for the administration of treatment or the protection of the patient or others from physical injury."[25]

The oral and written findings demonstrate that the superior court appropriately balanced the competing rights and interests. The court acknowledged that Annika had improved since her hospitalization, "becom[ing] more organized," meeting her basic needs by "sleeping and eating appropriately," and presenting as "appropriately dressed" and "clean." The court also noted that Annika was "able to engage in rational discussions, except regarding her discharge," and that she empathetically "help[ed] out with other patients" at API.

But the superior court weighed those findings against the API psychiatrist's testimony that Annika still suffered from "complex delusions" about her government work and responsibility to protect babies' brains from being infected with maggots. The court had a basis for relying on the psychiatrist's testimony because he was Annika's

---

[24] *In re Hospitalization of Mark V.*, 375 P.3d 51, 58-59 (Alaska 2016) *abrogated in part on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918, 924-31 (Alaska 2019).

[25] AS 47.30.915(11).

principal API provider.  The API psychiatrist acknowledged that he had not discussed the feasibility of Annika's proposed treatment plan with her VA psychiatrist.  But he explained that after consulting with Annika's care provider he had concluded that Annika's ongoing delusions made her proposed outpatient treatment plan infeasible. Commenting on Annika's testimony, the court noted that "[s]he clearly does get quite animated and agitated when she discusses those [delusions]."  The court found that her delusions caused "impaired judgment" and aggression, and it expressed concern about her ability to access a shelter, a medical provider, and a care provider — given her current care provider's continued unwillingness to be alone with Annika.  The court also noted that Annika had stopped taking her prescribed medications prior to her hospitalization, which had previously caused her to "rapidly" deteriorate. "Assessing the feasibility and likely effectiveness of a proposed alternative is in large part an evidence-based factual inquiry by the trial court."[26]  The factual findings demonstrate that the court did not rely solely on the API psychiatrist's opinion about the feasibility of Annika's outpatient treatment plan.  The court appropriately weighed all of the evidence before concluding there was no less restrictive alternative to continued hospitalization.

## V.    CONCLUSION

We AFFIRM the superior court's 90-day commitment order.

---

[26]    *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 185 (Alaska 2009).